THE CALLAWAY FAMILY ASSOCIATION, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 554–78X.    Filed December 5, 1978.

*Bruce R. Hopkins,* for the petitioner.
*Byron J. Furseth,* for the respondent.

## OPINION

WILBUR, *Judge:* Respondent determined that petitioner did not qualify for exemption from Federal income tax under section 501(a) as an organization described in section 501(c)(3).[1] Petitioner challenges respondent's determination and has in-

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise stated.

voked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428.[2] The issue for our decision is whether petitioner is operated exclusively for educational purposes within the meaning of section 501(c)(3).

This case was submitted for decision at an oral hearing held on October 12, 1978. The stipulated administrative record was submitted to this Court under Rule 217(b)(1), Tax Court Rules of Practice and Procedure. The evidentiary facts and representations contained in the administrative record are assumed to be true for purposes of this proceeding, and the administrative record is incorporated hereby by reference.

Petitioner the Callaway Family Association, Inc., was incorporated on September 3, 1975, as a nonprofit corporation under the District of Columbia Non-Profit Corporation Act. It filed a Form 1023, Application for Recognition of Exemption, under section 501(c)(3) on December 28, 1976. The application was filed with the Field Office of the Internal Revenue Service in Washington, D.C., and was forwarded to the Office of the District Director of the Internal Revenue Service in Baltimore, Md. Respondent issued a final notice of determination dated October 20, 1977, affirming a prior adverse determination of June 8, 1977, which denied petitioner exemption under section 501(c)(3). Respondent determined that petitioner's genealogical activities are not in furtherance of an exempt purpose specified in section 501(c)(3) and that they serve the private interests of the Callaway family members.

Petitioner's articles of incorporation set forth its purposes as follows:

A. To study British immigration to the North American colonies in the early colonial period and to further knowledge and understanding of the contribution made by the descendants of those early colonists to the subsequent growth and development of the continental United States by tracing the migratory patterns of succeeding generations and by researching the social and economic milieu in which they lived. In abstracting and collecting historical data in furtherance of this objective, *to concentrate research on the public and family records of the Callaway* (as variously spelled) and related families, as being typical of the times and places in which they lived;

---

[2]The statutory prerequisites have been satisfied: petitioner exhausted its administrative remedies, sec. 7428(b)(2); the petition was filed by the organization whose qualification is at issue, sec. 7428(b)(1); and petitioner mailed its petition before the 91st day after respondent mailed his determination in this matter, sec. 7428(b)(3). See also Rule 210(c), Tax Court Rules of Practice and Procedure.

B. To issue publications featuring abstracts of the raw historical and genealogical data collected and generalized articles based thereon and, ultimately, a synthesis of all collected data in the form of a history of social and economic development in pertinent parts of the United States, *as typified by the growth and dispersal of the Callaway and related families;* and

C. To provide instruction and education in the methodology of historical, biographical, and genealogical research, *encouraging the compilation and preservation of accurate and complete records,* and to promote scholarly writing.

[Emphasis added.]

These purposes are to be accomplished by activities including the annual publication of The Callaway Journal;[3] annual "meetings" with lectures;[4] workshops in genealogy research; and the ultimate publication of the history of the Callaway family.[5] This history, petitioner states, will be "an effort to chronicle the process of the peopling of America as seen through the eyes of one family."

Petitioner stated in its application that a service made available to its members as a direct result of its activities is "assistance with the compilation of their own pedigrees."[6] In further description of the benefits and services it would provide, petitioner stated in its application:

The "benefits" to be derived from this genealogical activity are highly intangible, but nevertheless real. Self-knowledge can only lead to greater family stability, benefiting both the individual and society, and a greater appreciation of the common heritage shared by all Americans.

Petitioner presently has about 600 members. Petitioner actively solicited these members by means of letters directed primarily to Callaways throughout the country. Though petitioner permits anyone to join its association, the 1975 solicitation letter was addressed to "My dear Callaway kin," and spoke of the need to create "a broad-based family association which could combine the time, talent, and financial support of an ever-increasing membership."

---

[3]Payment of annual dues is a prerequisite for membership and for receipt of the journal. Though major libraries may receive the journal free of charge, nonmembers and other libraries will be charged $5 a copy.

[4]The first annual meeting of the Callaway Family Association was held at Callaway Gardens, Pine Mountain, Ga., Oct. 1–3, 1976, and included speakers and a panel discussion.

[5]Ten percent of all dues received are placed in a savings account to cover the cost of publishing a Callaway family history. On Apr. 15, 1977, $999.49 was in this account.

[6]Petitioner stated that: "A research 'bank' has already been established under the custody and supervision of the Association's genealogist and will be constantly added to from year to year. All of this information will be available to answer individual inquiries of members."

In the 1976 solicitation letter, petitioner stated that:

The immediate focus of our historical studies is the genealogy of the Callaway family, tracing the descent of present members as completely and accurately as surviving records permit.

Ultimately, when the records have been sufficiently researched, a history of the Callaway family will incorporate the pedigrees of living descendants.

The letter went on to state that a major objective and resulting by-product of its other activities would be to identify and locate the living descendants of the original Callaway immigrants. This would "enable them to become acquainted with each other and enjoy the fellowship of family ties at annual and other meetings of a social nature."

The issue for our decision is whether petitioner is operated exclusively for educational purposes within the meaning of section 501(c)(3). Petitioner contends that its purposes are educational and benefit the general public. Petitioner maintains that its genealogical research and associated activities are a means to the end of providing insights to our country's history by use of a methodology which focuses on one family's development.

Respondent, on the other hand, contends that the petitioner's purposes primarily serve the private interests of its members, the Callaway family, no matter how diverse and widespread that family might be. Respondent maintains that the administrative record supports a finding that petitioner aimed its organizational drive at Callaway family members, and appealed to them on the basis of their private interests. In its ruling letter dated October 20, 1977, respondent concluded that petitioner did not qualify for exempt status because:

More than an insubstantial part of [petitioner's] activities consists of the compilation and publication of a genealogical history of the Callaway family, and this activity is not in furtherance of an exempt purpose specified in section 501(c)(3) of the Internal Revenue Code. Also [petitioner's], organization is serving the private interests of members of the Callaway family, rather than serving a public interest.

Petitioner has the burden of proof and to prevail must show that respondent's ruling is incorrect. Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure. We find that petitioner has failed.

Petitioner argues that there are "hundreds, perhaps thousands" of individuals who would become linked by participation

in its association. However, even though "family" may refer to many individuals with a common heritage, their interests, because of the size and diversity of the group, do not become a "public" interest. The mere number of members alone does not determine whether an organization's activities accomplish an exempt purpose. Whether there were 6 or 600 members, it is evident that they joined only because the purposes and activities of the organization were "for" and "about" Callaways.[7]

Respondent concedes that petitioner may have some "educational" purposes, as that term is used in section 501(c)(3),[8] such as its lectures, panels, and publication of The Callaway Journal. However, as respondent noted on reply brief, petitioner was not denied exemption because it has *no* exempt purposes, but rather because its activities, taken as a whole, are not "exclusively" dedicated to exempt purposes.[9] Petitioner also engages in nonexempt activities serving a private interest, and these activities are not insubstantial. We note specifically petitioner's emphasis on compiling members' family lines and the Callaway family history. Petitioner's activities, when aggregated, demonstrate that primarily private interests are being served. Any educational benefit to the public created by petitioner's activities is incidental to this private purpose.

Finally, petitioner relies heavily on Rev. Rul. 71–580, 1971–2 C.B. 235, in which respondent granted tax-exempt status to a family association that compiled a family's genealogy for religious purposes. Petitioner insists that respondent must follow his own revenue ruling. However, we need not pass on this argument for we find that Rev. Rul. 71–580 is distinguishable.

---

[7]Vol. 1, 1976, of The Callaway Journal, Editor's Note: "The Journal is for you, about you, and it needs your talent."

[8]Sec. 1.501(c)(3)–1(d)(3)(i), Income Tax Regs., refers to the term "educational" as relating to "the instruction of the public on subjects useful to the individual and beneficial to the community." It is important to note that especially in the area of defining "education," courts traditionally have broadly construed what would be considered "useful to the individual and beneficial to the community." Though the subject need not appeal to all individuals, its benefits must not be limited to one defined group such as the Callaway clan. Rather, there must be an indefinite group of beneficiaries.

[9]See *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945): "the presence of a single non-educational purpose will destroy the exemption regardless of the number of truly educational purposes." In *Baltimore Regional Joint Board Health and Welfare Fund, Amalgamated Clothing & Textile Workers Union v. Commissioner*, 69 T.C. 554 (1978), this Court applied the Better Business Bureau principle in determining whether the taxpayer organization served the private interests of its members.

Rev. Rul. 71–580 involved the narrow issue whether a family association furnishing "genealogical information the [Mormon] Church needs in order to conduct certain religious ordinances in accordance with basic religious doctrines" is an exempt religious organization under section 501(c)(3). The Mormon Church follows a practice of setting up family groups to study the genealogy of each member family back to Adam and Eve. This is part of a broader goal of the church to record the names of all deceased persons and to perform baptism upon them, since Mormon theology holds that salvation for the dead can be effected by the living. The names of all known ancestors collected by each family group are stored in a central location. These records, they believe, will be the basis for judgment on the last day, since deceased ancestors of members may be accepted into the church through their living family members.

It is evident that family genealogical associations play an integral role in Mormon religious practices. Accordingly, Rev. Rul. 71–580 analogized the exempt status allowed for this practice of the Mormon Church to cases which have upheld trusts for other religious practices, such as Catholic masses for the dead and Hebrew memorial services for the repose of souls. The law of charity has traditionally recognized trusts for these and similar religious purposes as charitable on the theory that the religious purpose of the trust is of spiritual benefit to all the members of that faith and to the general public as well. We believe that this is a sufficient basis for distinguishing petitioner's case from the narrow circumstances encompassed in Rev. Rul. 71–580.

Accordingly, for the reasons set forth we hold that petitioner failed to meet the requirements of section 501(c)(3), and that it does not qualify for tax-exempt status under that section.

*An appropriate decision will be entered.*