WESTERN CATHOLIC CHURCH, PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 8709–78X.    Filed October 31, 1979.

*John J. Vassen* and *James R. Kalish,* for the petitioner.
*Judith M. Picken,* for the respondent.

DRENNEN, *Judge:* This is an action for declaratory judgment
pursuant to section 7428(a), I.R.C. 1954.[1]

Respondent issued a final adverse determination to petitioner
on April 25, 1978, in which petitioner's previously granted tax-
exempt status under section 501(c)(3) was retroactively revoked.
The revocation was effective as of April 23, 1971, the date
petitioner was organized. Based upon an examination of peti-
tioner's activities during the 1972, 1973, and 1974 calendar years,
respondent determined that (1) petitioner was not, nor had it
ever been, operated exclusively for any of the purposes enumer-
ated in section 501(c)(3); and (2) a portion of petitioner's net
earnings had inured to the benefit of private individuals.
Petitioner challenges respondent's determination and it has
properly invoked the jurisdiction of this Court for a declaratory
judgment relating to its qualification as an organization de-
scribed in section 501(c)(3).[2]

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect in the
years in issue, unless otherwise specified.

[2]Petitioner has satisfied the following prerequisites for a declaratory judgment: It exhausted its
administrative remedies (sec. 7428(b)(2)); it filed the petition and its qualifications are at issue (sec.

The issues presented are whether petitioner was operated exclusively for a religious purpose[3] and whether a portion of petitioner's net earnings inured to the benefit of private individuals.

### FINDINGS OF FACT

Some of the facts were stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.[4]

Western Catholic Church[5] (hereinafter referred to as petitioner), was incorporated on April 23, 1971, pursuant to the General Not for Profit Corporation Act of Illinois, by S. Dean Slough (hereinafter referred to as Slough), Laura R. Slough, and Deana L. Hron. Laura R. Slough and Deana L. Hron are, respectively, the wife and daughter of Slough. These three individuals also comprised petitioner's board of directors. Petitioner's principal office, at all times relevant herein, was located in Quincy, Ill.

In its articles of incorporation and its bylaws, the following is set forth as the purpose of petitioner:

> To establish a church to embrace persons of all faith[s], color[s], and creed[s], to join for a common cause the betterment of man, by helping God in spreading the Gospel. To recuit [sic] evangalists [sic], to build, operate and maintain churches, hospitals, nursing homes, schools and to establish missionarys [sic] and missions whereever [sic] they are needed in the World. We believed [sic] the Bible to be the verbally inspired Word of God; the only infallible rule of faith and practice. We believe in the eternal Deity of Our Lord Jesus Christ; in His virgin birth; in His substitutionary death on Calvary for our sins; in His bearing of our afflictions and in His bodily reserrection [sic] from the grave. We believed in salvation by faith through the shed blood of Jesus Christ. We believe that the true church is composed of all those who have been born again. We believe in the present working and moving of the Holy Spirit in the lives of men, women, children; we believe in carry[ing] out the Great Commission. To evangelize is a vital part of our Christian responsibility. We believe all men are lost apart from the saving grace of Jesus Christ. We believe in the return of Jesus Christ, God's only begotten Son, to this earth.

---

7428(b)(1)); and it mailed its petition before the 91st day after respondent mailed his adverse determination in this matter (sec. 7428(b)(3)). See also Rule 210(c), Tax Court Rules of Practice and Procedure.

[3]Petitioner does not claim that it was operated for any of the other purposes mentioned in sec. 501(c)(3).

[4]In a declaratory judgment action concerning a revocation of a tax-exempt status, the Court may make findings of fact which differ from the administrative record. Rule 217(b)(1), Tax Court Rules of Practice and Procedure.

[5]The term "Catholic" was used in petitioner's name to mean "universal," rather than any affiliation with the Roman Catholic Church or any other organization which uses the term.

It was also provided that upon petitioner's dissolution, all assets would be paid to an organization exempt under section 501(c)(3). To accomplish its stated purposes, the articles of incorporation provided that petitioner had the power, inter alia, to buy, sell, mortgage, and lease real and personal property, to borrow money, and to invest in stocks and bonds.

On or about May 18, 1971, petitioner filed an application for recognition as a religious organization described in section 501(c)(3) and as exempt from taxation under section 501(a). Petitioner's stated purpose was "to further religion and benefit mankind." In the application, petitioner described its proposed activities as including the building of churches, colleges, nursing homes, and a hospital. Petitioner noted that it had not engaged in any of these activities as of the time it filed its application. Funds were to be raised by donations.

Following an interchange of letters between petitioner and the District Director, St. Louis, Mo., in which it was suggested to petitioner that it amend its articles of incorporation and its bylaws in certain respects,[6] which suggestions petitioner adopted, the District Director determined by letter dated October 13, 1971, that petitioner was exempt from Federal income tax under section 501(c)(3). The exemption was based on information supplied by petitioner, and it was conditioned on the assumption that petitioner's operations would be as stated in the application for exemption. Petitioner was also informed that it had to report any change in its purposes, character, or method of operation. The letter also specifically stated that no determination was made as to whether any of petitioner's proposed activities would give rise to unrelated business income subject to tax under section 511.

By letter dated July 10, 1974, the Regional Commissioner notified petitioner that an examination would be conducted in order to establish petitioner's continuing qualification as an exempt organization. The examination was commenced on August 20, 1974, and it covered the calendar years 1972, 1973, and 1974. As a result of this examination, respondent revoked petitioner's tax-exempt status.

Prior to petitioner's incorporation and during the years in

---

[6]One letter advised petitioner that its proposed activities of "building additional churches, a college, a hospital and nursing homes" would require separate exemption applications inasmuch as each would be considered separate entities.

question, Slough was president and owned 100 percent of the stock of both Credit Control Services, Inc., and Business Management Corp. Credit Control Services was in the business of collecting bad accounts. Business Management Corp. had some real estate holdings. Slough was also involved in a number of other business enterprises. Slough devoted full time to his business enterprises.

Slough decided to organize petitioner for two reasons: (1) In order to help other people; and (2) to have an organization in which Slough could be active and dictate some of the policies. Slough estimated it would take 10 to 15 years to get the program into operation.

During the years under examination, petitioner neither conducted religious services nor performed religious functions on a group basis.[7] Slough was petitioner's only minister, having been ordained by action of the voting members at the annual meeting held on May 15, 1972.[8] He had no theological training prior to that time or between then and the time of trial. No other minister was hired by petitioner, Slough preferring to retain petitioner's money in its building fund.

Although petitioner did not conduct services, Slough claimed he met on a one-to-one basis with individuals he knew in Quincy, Ill., and he attempted to get these individuals to commit themselves to becoming members of petitioner. He also counseled individuals with personal problems.[9] Slough believed that the growth of petitioner could be better accomplished by talking to people on a one-to-one basis than by holding religious services which were not well attended. Only Slough engaged in this one-to-one activity. He spent approximately 10 to 12 hours per month engaged in petitioner's activities. Although Slough claimed that there were 40 members of petitioner, only Slough,

---

[7] In 1975, Slough made arrangements with a church in Ohatchee, Ala., to hold group services for petitioner. The pastor of this church was a former business partner of Slough.

[8] At the same meeting, the members of the board of directors present were Slough, his wife, and his daughter. These individuals voted themselves into the following offices:

Slough ............ president
Deana Hron ...... vice president
Laura Slough .... secretary
Slough ............ treasurer

In its application for recognition as a tax-exempt organization, petitioner stated that no proposed member of the board or officers would be related, inter alia, by blood or marriage.

[9] Slough also testified that he performed wedding ceremonies. Although it is not clear when these ceremonies were conducted, it has not been established that they were conducted during 1972–74.

his wife and daughter, and two other individuals, one of whom was a former employee of Slough and the other of whom knew Slough prior to the incorporation of petitioner, have been identified as members. All it took to become a member was to accept the principles of petitioner and to agree to attend services when held in the future. Slough refused to divulge any list of petitioner's members, claiming such a divulsion would be an invasion of privacy. With the exception of Slough's wife's and daughter's participation in petitioner's annual meetings, evidence was not introduced to indicate that any individual other than Slough performed any activity for petitioner.

Slough has never received any salary or other form of compensation from petitioner and neither has Slough's wife, daughter, or businesses.

During 1972, Slough wrote checks to cash totaling $5,200 on petitioner's checking account. The principal evidence of the disposition of this money was Slough's testimony that the money was donated to individuals known to Slough and whom Slough personally determined to be in need of money. The individuals to whom the payments were made did not apply to petitioner for money. Slough considered these payments as a function of petitioner. The revenue agent who conducted the examination of petitioner was able to contact only one of the identified recipients. This individual verified that he received money from petitioner.

Petitioner stopped donating money following the advice of a certified public accountant to the effect that petitioner's inability to document what happened to the money would be troublesome if petitioner was audited. Slough chose to discontinue making payments rather than set up a bookkeeping procedure which he considered unnecessary for an organization that was not required to file tax returns.

For the taxable year ending December 31, 1972, Slough filed a joint return with his wife on which adjusted gross income of $61,258 was reported. From this amount, itemized deductions of $34,536 were subtracted, of which amount $29,975 represented contributions to petitioner. For the taxable year ending December 31, 1973, a joint return was filed on which was reported adjusted gross income of $126,990.17. From this amount, item-

ized deductions of $73,064.37 were subtracted, of which amount $63,495 represented contributions to petitioner.[10] For the taxable year ending December 31, 1974, a joint return was filed on which was reported adjusted gross income of $64,945. From this amount, itemized deductions of $18,006 were subtracted, of which amount, $6,370 represented charitable contributions.[11]

The parties stipulated that during 1972, 1973, and 1974, petitioner received the following amounts from Slough in the form of cash or checks deposited to petitioner's checking account:

| Year | Amount |
|---|---|
| 1972 | $7,000 |
| 1973 | 78,830 |
| 1974 | 12,150 |
| Total for 3 years | 97,980 |

No explanation was provided concerning the difference between the amounts deducted on the joint returns as charitable contributions to petitioner and the amounts which the parties stipulated were given by Slough to petitioner. Only two other individuals were identified as having contributed to petitioner, each having contributed $500. One of these individuals was a previous recipient of funds from petitioner.

It was represented in petitioner's application for exemption that petitioner would not receive 10 percent or more of its assets from any single organization or group of affiliated organizations or from any individual or members of a family group. Of petitioner's accumulated assets, estimated at approximately $190,000 as of the time of trial, Slough's contributions for the years under examination totaled $97,980.[12]

In 1971, petitioner requested John A. Benya, an architect, to design a church building. Mr. Benya worked without charge in his spare time and he completed a preliminary drawing of an elaborate church. The cost of the building, as conceptualized by

[10]Although contributions totaled $69,705, the sec. 170(b)(1) percentage limitation reduced the allowable charitable contribution deduction to $63,495.

[11]Of the charitable contribution deduction, $6,210 is the carryover of excess contributions from the preceding taxable year.

[12]No evidence was introduced concerning Slough's contributions to petitioner for years subsequent to those under examination. Apparently, a part of the accumulated assets represented gain on petitioner's securities transactions and dividends and interest received on its investments.

Mr. Benya, was estimated to be $4 to $5 million. As of the time of trial,[13] this estimate was considered low due to inflation. Plans to build a church never went beyond this preliminary drawing stage. The minutes of petitioner's annual meeting of voting members on May 15, 1973, reflect that it was agreed that at least $500,000 should be collected before any building project was started. This decision was reaffirmed at the annual meeting held on May 15, 1974.[14] Slough thought the overall success of the organization would come more quickly if a large church building was constructed.

During the years under examination, petitioner's primary activity had been one of making passive investments in order to accumulate money for the building fund. These investments were principally in certificates of deposit, stocks, and real estate. Petitioner borrowed considerable amounts of money from banks in order to finance its investment activity. At times, either Slough individually or one of his businesses would borrow money for petitioner. Slough or one of his businesses also provided the collateral for some of petitioner's bank loans. There was conflicting testimony as to whether petitioner repaid all amounts borrowed on its behalf, and it cannot be determined from the documentary evidence whether all repayments were made. Neither Slough nor his businesses charged petitioner for any amount in excess of what the bank charged them when loans were obtained for petitioner's benefit.

Petitioner had no assets at the time of filing its application for exemption. The only records maintained by petitioner for the period 1972 through 1974 were check stubs and minutes of annual meetings.[15] Initial contributions to petitioner were made by Slough. At the beginning of 1972, petitioner's only assets were the following three certificates of deposit:

---

[13]Trial was held in this case on Mar. 14, 1979.

[14]The minutes do not identify any "voting members" as being present other than the three directors.

[15]As a result, it was often difficult to retrace petitioner's financial dealings. This difficulty was compounded by petitioner's practice of applying checks received from its stock brokerage account directly against outstanding loans without first depositing the checks into petitioner's checking account.

| Certificate of deposit number | Issuance date | Market value |
|---|---|---|
| 5330 | Oct. 15, 1971 | $5,000 |
| 5348 | Nov. 26, 1971 | 6,000 |
| 5354 | Dec. 21, 1971 | 10,000 |

Said certificates had 12-month maturity periods and 5½-percent interest rates.

During the period under examination, petitioner acquired four certificates of deposit and a single time-savings certificate with a total market value of $42,500. Two of the certificates of deposit, with a total market value of $15,000, were transferred to petitioner from Credit Control Services.

During 1972, 1973, and 1974, petitioner transacted the following loans at 7½-percent and 8-percent interest rates:

| Loan number[16] | Date | Amount | Type |
|---|---|---|---|
| 1 | Oct. 12, 1972 | $7,000 | Commercial |
| 2 | Dec. 15, 1972 | 7,000 | Commercial |
| 3 | Dec. 15, 1972 | 7,500 | Commercial |
| 4 | May 2, 1973 | 20,000 | Business |
| 5 | May 3, 1973 | 62,000 | Commercial |
| 6 | Aug. 17, 1973 | 32,500 | Commercial |
| 7 | Oct. 9, 1973 | 13,000 | Commercial |
| 8 | Nov. 16, 1973 | 32,000 | Commercial |
| 9 | Dec. 3, 1973 | 20,500 | Commercial |
| 10 | Feb. 8, 1974 | 7,150 | Commercial |
| 11 | Feb. 26, 1974 | 28,600 | Commercial |
| 12 | Mar. 15, 1974 | 32,500 | Real estate |

With the exception of loan number 4, petitioner obtained the loans from the South Side Bank of Quincy, Ill. (subsequently the Town & Country Bank). Loan number 4 was obtained from Lewistown State Bank, Lewistown, Mo.

With the exception of the proceeds from loan numbers 1, 2, 7,

---

[16]For the purposes of clarity, sequential numbers were substituted for the actual loan numbers.

| Loan number | Actual number | Loan number | Actual number |
|---|---|---|---|
| 1 | 916.23 | 7 | 1911.21 |
| 2 | 1047.25 | 8 | 2022.21 |
| 3 | 1048.25 | 9 | 2075.21 |
| 4 | 11,679 | 10 | 2305.26 |
| 5 | 1384.21 | 11 | 2349.26 |
| 6 | 1704.21 | 12 | 2401.33 |

and 12, the ultimate use of the loan proceeds was not disclosed. Most of these loan proceeds were deposited in petitioner's checking account.[17]

The proceeds of loan number 1 were used by petitioner to purchase a new 1973 Lincoln Continental 2-door coupe for a total sales price of $7,080.49 on October 12, 1972. No sales tax was paid. Two of petitioner's certificates of deposit were assigned as security for the loan. This loan was repaid by petitioner on December 11, 1972.

The proceeds of loan number 2 were used by petitioner to purchase a new 1973 Lincoln Tour Car 4-door for a total sales price of $7,556.92 on December 14, 1972. No sales tax was paid.

The two automobiles were purchased in anticipation of two fundraisers being hired to work for petitioner. The automobiles were to be a part of the fundraisers' compensation. Subsequent to the purchase of the automobiles, however, Slough decided not to hire the two individuals. Both automobiles were then sold to Credit Control Services on January 5, 1973, for a total price of $17,749.66.[18] The terms of the sale required Credit Control Services to assume petitioner's $14,500 liability under loan numbers 2 and 3[19] and to execute a demand note at 7½-percent interest for the $3,249.66 balance. Loan numbers 2 and 3 were repaid in 1973 by Credit Control Services. As of December 31, 1974, neither the demand note nor any interest thereon had been paid. Credit Control Services claimed depreciation deductions for the two automobiles as a business expense.

Slough obtained a loan of $55,000 which was applied to petitioner's loan number 5 ($62,000), and Business Management Corp. obtained a loan of $10,000 of which $7,000 was applied to petitioner's loan number 5.

The proceeds from petitioner's loan number 7 were used to repay Slough and Business Management Corp. in part for their payments on petitioner's loan number 5. Of the $13,000 loan proceeds, $10,000 was paid to Business Management Corp.,

---

[17]Evidence was also introduced that an employee of Credit Control Services, Ben Fresno, without authorization, secured a loan and opened a stock brokerage account in petitioner's name. Fresno was not connected with petitioner in any way, and he did not have authority to use petitioner's name. Petitioner did not repay the loan nor did it benefit from the loan proceeds or the stock brokerage account.

[18]No evidence was introduced as to petitioner's use of the automobiles between the time of their purchase and their sale.

[19]Evidence was not presented concerning petitioner's use of the proceeds of loan number 3.

which was $3,000 more than petitioner owed Business Management Corp. The remaining $3,000 was applied against Slough's personal loan of $55,000. Slough thereafter paid off the balance of his personal loan as follows: (1) Petitioner's interest income check of $3,333.60; (2) petitioner's check of $44,154.93 received from its stock brokerage account at Lamson Bros. & Co. on October 2, 1973, *infra;* and (3) a $4,511.47 check written on petitioner's checking account.

Proceeds from loan number 12 were used in March 1974 to purchase an office building for $45,000.[20] The difference between the purchase price and the $32,500 loan was given to petitioner by Credit Control Services and treated as advance rentals by Credit Control Services. The building was purchased because of its investment potential and because Credit Control Services needed more office space. Under the terms of the lease, Credit Control Services leased the entire building, except for two rooms, at a monthly rental of $1,000. Credit Control Services was also required to pay all real estate taxes, maintenance, and insurance. The rent paid by Credit Control Services was reasonable. One of the rooms in the building could have been used for religious services.

On or about January 29, 1974, petitioner made a payment of $12,000 to Town & Country Bank (formerly the South Side Bank of Quincy) which was applied to Slough's loan account at the bank. Slough signed a note payable to petitioner evidencing the $12,000 loan.

In May 1973, petitioner opened an account with Lamson Bros. & Co. stock brokerage firm. A second account was opened in October 1974. Slough made the investment decisions for petitioner. Neither Slough, his family, nor any of his businesses had a stock brokerage account with Lamson Bros. & Co. During 1973, petitioner purchased 21,300 shares of stock in 24 separate transactions for a total cost of $379,361.69. In 9 transactions, petitioner sold 11,000 shares of stock for a profit of $25,569.59. As of December 31, 1973, petitioner had 10,300 shares in its account at a total cost of $183,812.30. During 1974, petitioner purchased 30,800 shares of stock in 20 separate transactions for a

---

[20]The purchase price of the building was stipulated by the parties to be $45,000. Other evidence was introduced which indicates that the purchase price was $45,500. This latter amount was also the sum of the loan and the advanced rentals received by petitioner. The $500 difference is not important to resolution of this case, however.

total cost of $239,845. In 20 transactions, petitioner sold 14,500 shares of stock for a profit of $25,885.18. As of December 31, 1974, petitioner had 27,900[21] shares in its accounts at a total cost of $175,670.01.

In May 1974, a cashier's check in the amount of $1,600 was issued to Deana Hron. The source of the funds for this check was a check from Lamson Bros. & Co. payable to petitioner.

By letter dated June 9, 1976, petitioner was informed by the District Director, St. Louis, Mo., that respondent proposed to revoke petitioner's tax-exempt status. A copy of the revenue agent's examination report was attached to the letter and it set forth the reasons for the proposed revocation, including the failure of petitioner to meet the operational test and the inurement of net earnings to the benefit of private individuals. As previously noted, respondent issued a final adverse determination on April 25, 1978.

OPINION

Section 7428(a) permits this Court under certain circumstances to make a declaration with respect to a final determination by respondent that a corporation is not an organization described in section 501(c)(3) and, therefore, not exempt from tax under section 501(a).[22] The term "determination" includes a revocation of an organization's tax-exempt status. (Sec. 7428(a).) The burden of proof is on petitioner to overcome the grounds for revocation of the exemption set forth in respondent's determination. Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure.[23]

---

[21]The parties stipulated to the number of shares bought, sold, and retained by petitioner. No explanation is provided for the difference between the number of shares stipulated as being held by petitioner as of Dec. 31, 1974, and the remainder arrived at by subtracting the total shares sold from the total shares purchased.

[22]Sec. 7428(a) provides in pertinent part:

(a) CREATION OF REMEDY.—In a case of actual controversy involving—

(1) a determination by the Secretary—

(A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) * * *

*　　*　　*　　*　　*　　*　　*

upon the filing of an appropriate pleading, the United States Tax Court * * * may make a declaration with respect to such initial qualification or continuing qualification. * * * Any such declaration shall have the force and effect of a decision of the Tax Court * * * and shall be reviewable as such. * * *

[23]Hancock Academy of Savannah, Inc. v. Commissioner, 69 T.C. 488, 492 (1977).

Section 501(a) and section 501(c)(3)[24] provide an exemption from Federal income tax for an organization if three conjunctive requirements are met: (1) The organization must be organized and operated exclusively for an exempt purpose; (2) no part of the net earnings of the organization can inure to the benefit of any private shareholder or individual; and (3) no substantial part of the activities of the organization includes carrying on propaganda, otherwise attempting to influence legislation, or participating or intervening in any political campaign. Failure to satisfy any of these requirements results in a denial of tax-exempt status. *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488, 492 (1977); *Harding Hospital, Inc. v. United States*, 505 F.2d 1068 (6th Cir. 1974). Respondent based this determination on the grounds that petitioner failed to satisfy requirements (1) and (2) above.

Respondent concluded that petitioner failed the "operated exclusively for a religious purpose" test because (1) petitioner did not actively engage in any religious-type functions in furtherance of its stated purpose; (2) petitioner's primary activity was the making of passive investments and accumulating income therefrom, which activity was not in furtherance of an exempt purpose and did not qualify it for tax-exempt status; and (3) some of petitioner's financial activities were for the benefit of private interests. Respondent's conclusion that petitioner had also failed the "inurement of net earnings" test is based on the assertion that petitioner has failed to establish that net earnings did not inure to the benefit of a private shareholder. In support of this assertion, respondent principally points to petitioner's inability to definitively document its financial dealings due to petitioner's inadequate records.

---

[24]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

* * * * * * *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

* * * * * * *

(3) Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

Petitioner asserts that its primary activities were the conversion of members through one-to-one missionary work by Slough and the accumulation of a fund for the construction of a church building, both of which were in furtherance of an exempt purpose. Petitioner further argues that the absence of any statutory or regulatory guidelines concerning minimum religious functions precludes the denial of exempt status on those grounds. Petitioner further contends that, in the absence of any statutory guidelines as to minimum activities, the main thrust of section 501(c)(3) is to prohibit organizations whose activities inure to the private benefit of shareholders from attaining tax-exempt status. Petitioner attempts to establish that it has factually satisfied the "inurement of net earnings" test by showing that all the transactions entered into by petitioner were for the financial benefit of petitioner.

Section 1.501(c)(3)–1(c)(1), Income Tax Regs., provides that an organization is not operated exclusively for an exempt purpose if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.[25] Section 1.501(c)(3)–1(d)(1), Income Tax Regs., further provides that an organization is not operated exclusively for an exempt purpose if it serves a private rather than a public interest.[26] Section 1.501(c)(3)–1(c)(2), Income Tax Regs., provides that an organization is not operated

---

[25]Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs., states:

"An organization will be regarded as 'operated exclusively' for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose."

[26]Sec. 1.501(c)(3)–1(d)(1)(i) and (ii), Income Tax Regs., states:

(i) An organization may be exempt as an organization described in section 501(c)(3) if it is organized and operated exclusively for one or more of the following purposes:

(a) Religious,

(b) Charitable,

(c) Scientific,

(d) Testing for public safety,

(e) Literary,

(f) Educational, or

(g) Prevention of cruelty to children or animals.

(ii) An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.

exclusively for an exempt purpose if its net earnings in whole or in part inure to the benefit of a private individual.[27]

The Supreme Court, in interpreting section 811(b)(8) of the Social Security Act, 49 Stat. 620, 639 (1935), which provided an exemption for corporations organized and operated exclusively for educational purposes', said in *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945):

in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes. * * *

The quotation from *Better Business Bureau* relates to "purpose" while section 1.501(c)(3)–1(c)(1), Income Tax Regs., relates more to "activities." In *Christian Manner International, Inc. v. Commissioner*, 71 T.C. 661, 668 (1979), it was stated:

Under the rationale of *Better Business Bureau* the existence of a substantial nonexempt purpose for a corporation's organization and existence would appear to defeat the exemption. But under the regulation, even if there was no nonexempt purpose for the organization and existence of the entity, it must actually engage primarily in activities which accomplish one of the exempt purposes, and if more than an insubstantial part of its activities do not further such exempt purpose, the entity is not exempt. It has been recognized, however, that an organization engaged in a single activity may have more than one purpose in conducting the activity. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 357 (1978). So we must be concerned with both the actual as well as the stated purposes for the existence of the organization and the activities it engages in to accomplish those purposes. What those purposes are and what purposes the activity or activities engaged in support are questions of fact. *Pulpit Resource v. Commissioner*, 70 T.C. 594 (1978).

There is no question that, based on its articles of incorporation, petitioner was *organized* for a religious purpose. No activities were conducted, however, which accomplished the stated purpose.

Petitioner argues that it conducted two activities in further-

---

[27]Sec. 1.501(c)(3)–1(c)(2) states:

"An organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals. For the definition of the words 'private shareholder or individual', see paragraph (c) of sec. 1.501(a)–1."

The prohibition against private inurement of net earnings appears redundant, since such a benefit would be inconsistent with operating exclusively for an exempt purpose. See *Lowry Hospital Association v. Commissioner*, 66 T.C. 850, 857 n. 8 (1976); *B.H.W. Anesthesia Foundation, Inc. v. Commissioner*, 72 T.C. 681, 684 n.3 (1979).

ance of its exempt purpose: (1) One-to-one missionary work by Slough; and (2) accumulation of a building fund. For the reasons set forth below, we conclude that these activities are not in furtherance of petitioner's stated purpose.[28]

During the years under examination, petitioner did not conduct religious services.[29]

In addition to Slough, his wife, and his daughter, positive evidence was introduced to identify only two other individuals as members of petitioner. Slough claimed that petitioner had 40 members, but he refused to reveal their identities claiming it would be an invasion of privacy.

Objective evidence of the number of petitioner's members is certainly relevant to our inquiry concerning the nature of the activities of petitioner and whether it was operated exclusively for religious purposes. *Bronner v. Commissioner*, 72 T.C. 368 (1979). Since petitioner bears the burden of proving that it is entitled to tax-exempt status, and in the absence of objective evidence indicating a greater number, the Court must proceed as if petitioner had only five members. This is not to say that an organization of such small dimensions cannot qualify for tax-exempt status.[30] It is certainly relevant, however, in determining the extent of Slough's one-to-one activities, which petitioner claims as one of its religious activities.

The only evidence of Slough's one-to-one activity was the generalized testimony of Slough and the testimony of two other witnesses to whom Slough had talked. Both of the other witnesses were acquaintances of Slough's prior to the formation

---

[28]Although Slough testified that he considered the money he allegedly distributed to needy individuals a function of petitioner, it was not cited by petitioner as an activity in support of its stated purpose. Considering that this activity was conducted for only a short time in 1972, it would not aid petitioner's case. Furthermore, it has been held under similar circumstances that grants made on a personal basis rather than in an objective and nondiscriminatory manner do not constitute an activity in furtherance of an exempt purpose. *Church In Boston v. Commissioner*, 71 T.C. 102, 107 (1978).

[29]Respondent cites the absence of any such services as evidence that petitioner was not operated exclusively for tax-exempt purposes. Petitioner argues that the absence of any statutory or regulatory guidelines concerning minimum religious functions precludes the denial of exempt status on those grounds; that to deny petitioner tax-exempt status solely because it failed to conduct religious services would run afoul of the First Amendment guarantee of freedom of religion; and that any attempt to set forth guidelines concerning the type of religious activity necessary to qualify for tax-exempt status would be constitutionally suspect. Nonetheless, the type of activities engaged in by an organization is central to our inquiry as to whether that organization is operated exclusively for tax-exempt purposes. Had petitioner conducted services, it certainly would have been a factor to consider. Its not doing so, however, while not a negative factor *per se*, is something which must be considered, given the stated purpose of petitioner to build churches in which, presumably, religious services would be held.

[30]See *Blake v. Commissioner*, T.C. Memo. 1970–117.

of petitioner. While they both agreed to become members of petitioner, there is no evidence that they actually did become members or that they participated in any way in religious functions with petitioner. The evidence indicates that all it took to become members of petitioner was to accept petitioner's general tenets and agree to attend future services. One of these witnesses was the recipient of a grant from petitioner, and both apparently had some personal problems that Slough discussed with them. The amount of time spent by Slough on such discussions was minimal, and we believe Slough's efforts were motivated more by personal reasons than in preaching the gospel. At best, Slough's ministries were directed to the problems of private individuals rather than to the public at large. See *Callaway Family Association v. Commissioner*, 71 T.C. 340 (1978). Petitioner has failed to convince us that this one-to-one activity of Slough was a religious activity conducted in behalf of petitioner. And the evidence indicates that no one other than Slough performed any activities in behalf of petitioner.

Illustrative of the fact that Slough's activities were more personal than church oriented is the manner in which Slough selected the individuals who allegedly received the money from the checks Slough wrote on petitioner's bank account to cash. Slough testified that the individuals selected were people whom Slough personally knew to be in need of funds. These individuals neither applied to Slough nor to petitioner. Rather, Slough unilaterally selected them. The grants were not made in an objective and nondiscriminatory manner based on established criteria. It has been held that grants made on a personal basis do not constitute exempt activity. *Church in Boston v. Commissioner*, 71 T.C. 102 (1978). This type of personal activity by Slough, while commendable, cannot be said to be the activity of petitioner.

Petitioner's primary, if not sole, activity was the making of passive investments. This included investments in certificates of deposit, stocks, and real estate. It borrowed considerable amounts of money in order to finance its investment activities. During both 1973 and 1974, it made a profit in excess of $25,000 from its buying and selling of stocks.

Petitioner's involvement in a moneymaking activity is not a per se bar to qualification as a tax-exempt organization. *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. 202, 211 (1978); *Pulpit*

*Resource v. Commissioner, supra; Orton v. Commissioner,* 56 T.C. 147 (1971). The question is what purpose is accomplished by this activity. The avowed purpose was to make a profit in order to accumulate money with which to build a church. Thus, the Court is not presented with a case where the moneymaking activity, in and of itself, accomplished an exempt purpose. Compare *Pulpit Resource v. Commissioner, supra; Orton v. Commissioner, supra; Saint Germain Foundation v. Commissioner,* 26 T.C. 648 (1956).

However, the prospects of accomplishing the avowed purpose at any time in the foreseeable future appears remote. While an architect friend of Slough's had made preliminary sketches of an elaborate church building during his spare time, nothing had been done to follow through on the design. Slough testified that it would have cost $4 to $5 million to build such an edifice at the time it was sketched, and that due to inflation, the cost would be considerably more today. Slough testified that petitioner had about $190,000 in assets at the time of the trial, 7 years after petitioner was formed. About $50,000 of this amount was produced by petitioner's investment activities, and most of the balance came from contributions by Slough, who had contributed almost $100,000 to petitioner by the end of 1974. There is no evidence that petitioner solicited either the public or its members for contributions.[31]

The facts present in the instant case are similar to those in *Randall Foundation v. Riddell,* 244 F.2d 803 (9th Cir. 1957). In *Randall Foundation,* the principal activity of the organization was securities trading. Most of the profit earned from such activity was accumulated, although small charitable contributions were made. Testimony was introduced in that case to the effect that the accumulated funds were to be used for a boys' home but that more funds were needed before that objective could be pursued. In holding that the organization's principal activity was the trading of stocks and that it was not tax exempt, the Court stated:

It is not our intention to say that a case can never be made out on the facts of a particular situation for aggregation of funds by a corporation for ultimate disposition to a charitable purpose. But a corporation which in its inception

---

[31]Apparently, the only other contributions received by petitioner were two contributions of $500 each, but we cannot be certain that these were not repayments of cash given the contributors by Slough.

engages in trade, business or speculation, and only has a vague charitable design, does not in our opinion come within the terms of the statute. * * * [244 F.2d at 804–805; fn. ref. omitted.]

As in *Randall Foundation*, petitioner had no obligation to use the accumulated funds for the avowed purpose. The similarities between the two cases as to the nature of the profit-making activities, the accumulation of those profits, and the vague, ultimate, albeit potentially exempt, disposition of those profits make *Randall Foundation* difficult to distinguish. We therefore find that petitioner was not primarily engaged in activities which accomplished a tax-exempt purpose.

In addition, petitioner has failed to convince us that petitioner was no more than insubstantially operated for the private benefit of Slough or that no net earnings inured to the benefit of private individuals. The prohibition against operation of an organization for a private benefit is but another way of requiring that an organization be operated exclusively for tax-exempt purposes, i.e., for public benefit. Sec. 1.501(c)(3)–1(d)(1)(i) and (ii), Income Tax Regs. Although the requirement that an organization be operated exclusively for tax-exempt purposes (and not for a private benefit) is statutorily distinct from the prohibition against the inurement of net earnings to the benefit of private individuals, for convenience, both requirements will be discussed together because much of the evidence is applicable to both.[32] No single factor or combination thereof controls our conclusion. Rather, these factors, taken in the aggregate, require the conclusion we reach.

Slough testified that one of his reasons for organizing petitioner was to have an organization in which he would participate and dictate some of the policies. The amount of control Slough exercised over petitioner's operations and the blurring of the lines of demarcation between the activities and interests of petitioner, Slough, and Slough's wholly owned corporations make it impossible to conclude that petitioner was operated for a public benefit rather than a private interest.

Slough made large contributions to petitioner for which he took charitable contribution deductions. This money, however, never passed out of Slough's control since he dominated

---

[32]See n. 27.

petitioner. Nor was any substantial portion of this money ever expended other than for investment purposes. Thus, in effect, Slough was able to reduce his current taxable income for donations which never left his control. In addition, one of the reasons for petitioner's purchase of an office building, its only investment in real estate, was Credit Control Services' need for more office space. Petitioner's downpayment for the building was provided by Credit Control Services as advance rental and the building was leased under a net lease. Thus, Credit Control Services was able to currently deduct the "cost" of the building. It was also able to use petitioner's credit. It is recognized that the office building may have been a good investment for petitioner and that Credit Control Services paid a reasonable rent. Nevertheless, when petitioner's investments are dictated in part by the needs of private interests, it cannot be said that petitioner was operated exclusively for the public benefit.

Considerable evidence was introduced concerning petitioner's financial transactions. There is a dispute between the parties about whether, as a result of several transactions, Business Management owed petitioner $3,000 or petitioner owed Business Management $10,000. Petitioner's failure to keep adequate records and the manner in which money was handled and loans were paid make it impossible to trace completely petitioner's financial transactions. In any event, it is clear that money passed back and forth between petitioner and Slough and his businesses whenever one or the other needed the cash. Petitioner was utilized by Slough as an "incorporated pocketbook" into which he could transfer excess personal funds, claiming tax deductions, while he still retained complete control of the funds and used them for purposes unrelated to religious activities. Meanwhile, the income and gain from petitioner's investment activities was intended to be tax free. And based on past history, this situation will continue to exist for a long time. And even if petitioner should eventually build a church and conduct public services, Slough would, presumably, continue to control the use of its funds. As he testified, one of the reasons Slough organized petitioner was to have an organization in which he could participate and dictate policies.

In addition, petitioner failed to introduce adequate evidence to prove that Slough's writing of $5,200 in checks to cash and the payment of $1,600 to Slough's daughter did not inure to the

benefit of private individuals. Slough's testimony alone is not sufficient. It was not only uncorroborated by records or the testimony of other witnesses, but his explanation of why the $1,600 was given to his daughter was inconsistent with the explanation he had given the revenue agent.

Based on the evidence produced, we cannot conclude that as a result of its financial transactions, no part of petitioner's net earnings inured to the benefit of Slough or members of his family or one of his wholly owned corporations. In view of petitioner's burden of proof, this question must be resolved in favor of respondent.

In summary, we conclude that petitioner was not operated exclusively for a purpose exempt under section 501(c)(3), that petitioner has failed to establish that no part of its net earnings inured to the benefit of a private individual, and that respondent properly revoked petitioner's previously granted exemption.[33]

*An appropriate order will be entered.*

_____

[33]Petitioner does not make the alternative argument that regardless of whether it is entitled to tax-exempt status, the respondent's determination should not be retroactively applied. In view of respondent's authority to retroactively revoke the tax-exempt status of an organization (sec. 7805(b), sec. 1.501(a)–1(a)(2), Income Tax Regs.), this issue need not be addressed.