ORANGE COUNTY AGRICULTURAL SOCIETY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Orange County Agricultural Soc. v. Commissioner
Docket No. 397-81"X"
United States Tax Court
T.C. Memo 1988-380; 1988 Tax Ct. Memo LEXIS 407; 55 T.C.M. (CCH) 1602; T.C.M. (RIA) 88380; August 16, 1988
Joseph *408 B. Murphy, for the petitioner. Cheryl Choy-Weller, for the respondent. JACOBS
MEMORANDUM OPINION JACOBS, Judge: Respondent made an adverse determination as to petitioner's continuing tax exempt qualification under section 501(a), [1] effective for tax years beginning after October 31, 1974. Petitioner challenged that determination by instituting this proceeding for a declaratory judgment under section 7428. The ultimate issue for decision is whether petitioner (the Society) is operated exclusively for exempt purposes within the meaning of section 501(c)(3). To resolve the ultimate issue, we must determine (1) whether the Society's involvement in a stock car racing enterprise (a nonexempt purpose) constitutes more than an insubstantial part of its activities, and (2) whether the Society engaged in acts (i.e., the making of unsecured, interest-free loans) which resulted in the inurement of benefits to two corporations both of which were owned by persons having a controlling interest in the Society. FINDINGS OF FACT Some of the facts in this case have been stipulated *409 and are so found. The stipulation of facts, stipulated administrative record and exhibits attached thereto are incorporated herein by this reference. The Society was incorporated in the State of New York in 1866; [2] its principal place of business at all relevant times was Middletown, New York. It has a fiscal year ending October 31st. The Society was organized to promote agriculture and horticulture in Orange County, New York. In furtherance of these purposes, the Society annually sponsors the Orange County Fair (the Fair) which is held between late July and early August. [3] The Fair is held on 43.5 acres owned by the Society (the fairgrounds) in Middletown. The activities at the Fair include the exhibiting and judging of animals, farm and garden products, arts, crafts, sewing, canned goods, etc. In addition, the Fair has contests, carnival rides, music, entertainers, and a demolition derby. A clay, oval racetracek (the Speedway) *410 and grandstand are located on the fairgrounds. The Speedway, which was constructed in the 1880's for horse racing, has been used since 1928 to conduct automobile races. It is also used for other events, such as tractor pulls. As of November 1, 1974, the Society's outstanding stock was held as follows: Shareholder
Shares
Michael Gurda
251
Michael A. Gurda, Jr.
250
Alfred Howard
502
Others [4]
400
1,403
The number of shares outstanding, as well as the ownership interests of Messrs. Gurda and Gurda, Jr., have remained unchanged since 1974. Alfred Howard died in 1977; the 602 share owned by him at death were sold on June 30, 1978 to Charles A. Slutsky who is now deceased. The record is silent as to the present owner(s) of the 502 shares purchased by Mr. Slutsky. Michael Gurda is the Society's counsel and has served on its board of directors. Michael Gurda, Jr. is currently the president of the Society. From November 1, 1974 until sometime in 1981, Elizabeth Gessner was the Society's president. Mr. Howard had been an officer of the Society. To provide additional parking during the Fair, *411 the Society leased adjacent land from Middletown-Wallkill Improvement Corporation (M-W), a for-profit corporation. Messrs. Gurda and Gurda, Jr. each own 25 percent of M-W's stock; Mr. Howard (until his death) owned the other 50 percent. Mr. Howard's stock in M-W was sold to Mr. Slutsky on June 30, 1978 (the same date as Mr. Howard's stock in the Society was sold to Mr. Slutsky.) Ms. Gessner served as the president of M-W between 1976 and 1979. The Society was required to pay the real estate taxes on the land leased from M-W; the Society was not required to pay any other amount to M-w. The record does not disclose the fair rental value of the leased property. At least as early as January 15, 1973, and at various times thereafter, the Society made unsecured, interest-free loans to M-W. At the time these loans were made, the Society owed money to others on which it was required to pay interest. Some of the loans to M-W were repaid within several months; as to the other loans, the dates of repayment, if any, are unknown. Orange County Fair Speedway, Inc. (now OCF Motor Racing, Inc. and hereinafter referred to as OCF) was organized to conduct automobile races at the Speedway *412 and was formed to insulate the Society from potential liability. At its inception, all the stock in OCF was owned by Mr. Howard. Mr. Howard's stock in OCF was sold to Mr. Slutsky on June 30, 1978 (the same date as Mr. Howard's stock in the Society and in M-W was sold to Mr. Slutsky). Ms. Gessner served as president of OCF from 1976 through 1979. On February 21, 1967, the Society and OCF entered into a lease pursuant to which OCF leased the Speedway for a 5-year term. OCF was to conduct automobile races on specified Saturday nights between April 1st and October 15th of each year during the lease term. The rent payable to the Society was 25 percent of gross receipts (other than from concessions) after payment of all expenses incurred in operating the races. Concessions receipts were to be divided equally between OCF and the Society. On April 7, 1975, the lease term was extended and OCF agreed to pay the Society all racing receipts (rather than the previous 25 percent) after payment of all operational expenses. OCF hired all persons required to conduct the automobile races, however, such persons had to be satisfactory to the Society. The Society was required to maintain *413 the Speedway in good condition. It repaired (at its own expense) the damages which occurred during the races even though OCF was contractually obligated to do so. In addition, the Society paid the clean-up expenses after the races were concluded. The Society was not involved in the actual operation of the automobile races; it did not determine the size of the purses, the qualifications of the drivers, nor the amount of salary which OCF paid to persons (including the officers of OCF) to run the races. During 1975 and subsequent years, races at the Speedway occurred on Saturday nights, as well as on Wednesdays during the Fair. Typically, races were held 24 to 25 times each year. For its fiscal years ended October 31, 1975 through 1977, the Society received the following amounts with respect to the automobile racing activities: Fiscal Year Ending
Liquor and
October 31
Rent
Food Sales
1975 [5]
$ 120,000
$  77,500
1976   131,000
73,000
1977   128,784
104,257
The Society made numerous unsecured, interest-free loans to OCF. These loans were made to enable OCF to *414 meet its annual start-up costs. At the time the Society made these loans it had its own loans outstanding on which it was required to pay interest. The repayment date, if any, of several of the loans are unknown. The Society was granted tax exemption as an educational organization in June, 1953. Sometime in 1978, respondent audited the Society for years 1975 through 1977. On October 15, 1980, respondent issued a notice of adverse determination with respect to the Society's exempt status. Respondent determined that the Society's exempt status should be revoked, effective for all tax years beginning after October 31, 1974, because, respondent contends, the Society was associated in the operation of a race track enterprise, an activity which was not in furtherance of its exempt purpose. Respondent further contends that the Society extended unsecured, interest-free loans to related corporations which resulted in serving a private rather than a public interest. OPINION Petitioner seeks a declaratory judgment pursuant to section 7428[6] with respect to its continuing qualification for tax exemption under Section 501(a) as an organization described in section 501(c)(3). *415 Section 501(c)(3) describes as one of the types of organizations entitled to tax exemption under section 501(a) a corporation organized and operated exclusively for educational purposes, provided that no part of its net earnings inure to the benefit of a private shareholder or individual, and further provided that no substantial part of its activities consists of political or lobbying activities. The organizational and operational tests must be independently satisfied. Sec. 1.501(c)(3)-1(a), Income Tax Regs. Respondent concedes that the Society was organized for exempt purposes; he contends, however, that the Society was not operated exclusively for exempt purposes. An organization is considered to be "operated exclusively" for exempt purposes if it engages primarily in activities which accomplish one or more exempt purposes; an organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. Better Business Bureau v. United States,326 U.S. 279 (1945); sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. *416 Whether an organization satisfies the operational test is a question of fact to be resolved on the basis of all the evidence presented by the record. Church of Scientology of California v. Commissioner,83 T.C. 381, 474 (1984), affd. 823 F.2d 1310 (9th Cir. 1987); Leon A. Beeghly Fund v. Commissioner,35 T.C. 473, 518 (1960). Respondent contends that because the Society received all the profits derived from the automobile races, the Society was associated in the operation of a commercial enterprise which was not in furtherance of its stated exempt purpose (i.e., to promote agriculture and horticulture in Orange County, New York). We agree. The Society's involvement in the automobile racing activities exceeded the benchmark of insubstantiality. The Society received a substantial interest in the profits from such activity; in fact from April 1975 onward, it received 100 percent of the profits. Further, the Society advanced money to OCF to meet the annual start-up expenses. The Society paid for repairs necessitated by damage during the races; it also maintained a stand-by electrical crew. The totality of the facts inescapably *417 leads us to the conclusion that the arrangement between the Society and OCF was more than that of a lessor and lessee. In reality, OCF was but a corporate shield designed to protect the Society against potential liability arising from the conducting of automobile races at the Speedway. The Society argues that merely because it received all the profits from the racing activities, it does not follow that the Society was the alter ego of OCF. The Society also argues that there was no diversion of funds from it to its shareholders. Such arguments miss the point; to be tax-exempt, the Society must be operated exclusively for exempt purposes, and the Society involvement in the racing activities at the Speedway was not in furtherance of its exempt purpose. The Society further argues that the money is received from the racing activities as "rent" constitutes a "vital part of its cash flow," and if it did not receive such funds it could not continue to function. Again, these arguments miss the point. The fact that the racing activities provide the Society with substantial income does not make the racing activities substantially related to the Society's exempt educational purpose. *418 Although we could sustain respondent's determination solely on the basis of the Society's involvement in the racing activities, for the sake of completeness we deem it appropriate to address respondent's other position in denying continuing tax exemption to the Society.
An organization is not operated exclusively for an exempt purpose unless it serves a public rather than a private interest; thus, an organization must establish that it is not operated for the benefit of private interests, such as designated individuals, the creator, shareholders of the organization, or persons controlled (directly or indirectly) by such private interests. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. See Callaway Family Association v. Commissioner,71 T.C. 340 (1978); Baltimore Health and Welfare Fund v. Commissioner,69 T.C. 554 (1978). In this regard, the exempt organization's net earnings cannot inure, in whole or in part, to the benefit of private shareholders or individuals, i.e., persons having a personal and private interest in *419 the activities of the organization. Secs. 1.501(a)-1(c), 1.501(c)(3)-1(c)(2), Income Tax Regs. Net earnings include more than net profits and may inure to an individual in more ways than in the distribution of dividends. Harding Hospital, Inc. v. United States,505 F.2d 1068 (6th Cir. 1974); General Contractors' Assn. of Milwaukee v. United States,202 F.2d 633 (7th Cir. 1953); Chattanooga Auto. Club v. Commissioner,182 F.2d 551 (6th Cir. 1950), affg. 12 T.C. 967 (1949); Unitary Mission Church v. Commissioner,74 T.C. 507, 513 (1980), affd. without published opinion 647 F.2d 163 (2d Cir. 1981); Founding Church of Scientology v. United States,188 Ct. Cl. 490, 497, 412 F.2d 1197, 1200 (1969), cert. denied 397 U.S. 1009 (1970); Lowry Hospital Association v. Commissioner,66 T.C. 850, 857 (1976). Here, the Society did not charge interest on the loans it made to OCF and M-W; further, the repayment dates, if any, are unknown. The use of the Society's funds without interest constitutes a benefit to the borrowers (M-W and OCF), both *420 of whom were owned by persons having a controlling interest in the Society. Thus, as a result of these loans, part of the Society's earnings inured to the benefit of private interests which is in contravention of section 501(c)(3). See Unitary Mission Church, supra;Western Catholic Church v. Commissioner,73 T.C. 196, 211 (1979); Church in Boston v. Commissioner,71 T.C. 102, 106-107 (1978). In summary, we hold that respondent properly revoked the Society's previously granted tax exemption. To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended. ↩
2. Prior to 1866, the Society was operated as an unincorporated entity. ↩
3. Petitioner has been operating the Fair since 1840. Prior to 1980, the Fair was held for nine days; since 1980, the Fair has been held for twelve days. ↩
4. No other shareholder owned more than 50 shares. ↩
5. Figures for 1975 and 1976 are approximate. ↩
6. Section 7428 provides, in relevant part, as follows: (a) CREATION OF REMEDY. -- In a case of actual controversy involving -- (1) a determination by the Secretary -- (A) with respect to the * * * continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) * * * upon the filing of an appropriate pleading, the United States Tax Court * * * may make a declaration with respect to such * * * continuing qualification * * *
The prerequisites for declaratory judgment have been satisfied: the Society is the organization whose qualification is at issue (sec. 7428(b)(1)); the Society exhausted its administrative remedies (sec. 7428(b)(2)); and the Society filed its petition before the 91st day after respondent mailed his determination (sec.7428(b)(3)). See also Rule 210(c), Tax Court Rules of Practice and Procedure.↩