U. S. CB RADIO ASSOCIATION, No. 1, INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
U. S. CB Radio Asso. v. Commissioner
Docket No. 14954-80X.
United States Tax Court
T.C. Memo 1981-601; 1981 Tax Ct. Memo LEXIS 135; 42 T.C.M. (CCH) 1441; T.C.M. (RIA) 81601; October 19, 1981. John J. O'Brien, for the petitioner. David N. Brodsky, for the respondent. TIETJENS
MEMORANDUM OPINION TIETJENS, Judge: Respondent determined that petitioner does not qualify for exemption from Federal income tax under section 501(c)(3)[1] and revoked its exempt status retroactive to June 28, 1976. Petitioner, challenging respondent's adverse determination, has invoked the jurisdiction of this Court for a declaratory jdugment pursuant to section 7428. [2]
*137 The issue for our determination is whether petitioner is operated exclusively for one or more exempt purposes within the meaning of section 501(c)(3). This case was submitted for decision on a stipulated administrative record under Rules 122 and 217, Tax Court Rules of Practice and Procedure. The stipulated record, which is assumed to be true for the purpose of this proceeding, is incorporated herein by reference. Petitioner, incorporated on June 28, 1976 under the Nonstock Corporation Act of the State of Connecticut, had its principal place of business in Hartford, Connecticut when its petition was filed. Petitioner filed an application for recognition of exemption on June 28, 1976 and by letter dated August 19, 1976, respondent determined petitioner was entitled to exemption from Federal income taxation under section 501 (c)(3). On March 15, 1978, petitioner filed its initial return (Form 990) covering the fiscal year ended July 31, 1977. By letter dated May 6, 1980, respondent issued a final adverse ruling letter revoking petitioner's exempt status retroactive to June 28, 1976 for the following reasons: We have concluded that you are operated primarily to serve the *138 private purposes of your members, which are not section 501(c)(3) purposes. Petitioner's certificate of incorporation states that petitioner was organized for the following purposes: Said corporation is organized exclusively for non-profit, educational purposes, including for such purpose, the following activities: (i) The creation of a forum for, and the fostering of, and the education of citizens band radio operators throughout the United States and elsewhere through panel discussions, lectures, panels, mailings, course and similar means. (ii) To publish and distribute a newsletter dealing with topics of interests to citizens ban radio users and which addresses itself to questions submitted by such users. (iii) To create a nationwide network of citizen band radio registration to promote increased theft security against the loss of citizens band radios and related equipment, and to educate its members regarding same. *
(iv) To issue decals, membership cards, stickers, bumper stickers and similar items to its members. (v) To make distributions *139 to organizations that qualify as exempt organizations under Section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provisions of any future United States Internal Revenue Law). Petitioner is a membership organization open to all who submit annual dues of $ 12. Memberships are solicited through the use of mailing lists that are available from a Federal agency which lists licensed CB operators. Petitioner's solicitation material states the following member benefits: (1) $ 5,000 travel accidental death or dismemberment insurance policy (2) a CB operations handbook (3) a subscription to petitioner's newsletter (4) membership certificate, card, and auto decal (5) a highway map of CB channels throughout the United States
(6) national anti-theft registration program (7) legal counseling service (8) various discount programs (9) travel services (10) annual convention The travel insurance is provided through an insurance company at an annual cost to petitioner of $ 2.12 per member. The anti-theft program involves petitioner's maintaining a file of its members' CB equipment registration or serial numbers. The legal counseling *140 service consists of petitioner's providing its members with a list of telephone numbers to call in order to obtain advice on legal matters encountered while traveling. Petitioner does not pay for this service, the list is furnished by a separate organization, and the member must make his own arrangements regarding the attorney's services. Finally, petitioner's discount programs include arrangements for discounts on car rentals, prescription medicines and vitamins, brand name merchandise, film and film developing, and travel excursions and lodging. Petitioner operates a television interference inquiry center and disseminates an informational kit, holds educational seminars for its members and the public, and maintains a technical telephone hotline and inquiry center to answer questions about the proper use of CB radio, technical areas, rules/regulations, etc. Besides those publications listed in its promotional material, petitioner distributes a truckers' emergency code card to familiarize its members with common terminology used on the road and for emergencies and a "plain English" version of Federal Communications Commission's (FCC) rules and regulations for its members and *141 the general public. Also, petitioner is a member of the FCC's Personal Use Radio Advisory Committee (PURAC) and has served on several of PURAC's subcommittees. During its fiscal year ended July 31, 1977, petitioner received its support from membership dues, mailing subsidies, personal loans, and a contribution of all the stock of a closely held corporation from one of petitioner's officers. Mailing subsidies were amounts received towards mailing costs for the inclusion of advertising materials with mailings to members or prospective members. Petitioner's expenditures for the fiscal year ended July 31, 1977 consisted of the following: (1) Compensation of officers
Mark Wertheim
$ 1,940
(2) Other Expenses
Mailing expenses & postage
$ 108,000
Printing & stationery
86,387
Members benefits [1]
37,815
Computer service
24,321
Office expense
7,717
Professional services
3,596
Travel & entertainment
1,517
Telephone
1,245
Publicity
1,250
Subscriptions - dues
125
Miscellaneous
4,519
Contributions
40
Seminars
150
News letter
1,463
Bad debt
487
Bank charges
916
$ 279,548
*142 Petitioner contends that it operates as an educational organization for the benefit of the public and that the percentage of its revenues used for its insurance and discount plans is insubstantial. In its protest, petitioner argued that the insurance and discount programs were essentially a "drawing card," its way of attracting new members, not unlike the rallies, dinners, and similar fundraising events held by many tax-exempt organizations. Respondent, by contrast, asserts that petitioner fails the operational test since it has failed to establish that it is operated for an educational or other exempt purpose within the meaning of section 501(c)(3). Moreover, respondent argues that petitioner is operated for the substantial nonexempt purpose of providing benefits for its members. Specifically, respondent alleges, petitioner served its members' private interests by providing them with numerous benefits including low cost insurance, a C.B. handbook, membership discount programs, and travel and legal services. Respondent's final ruling letter denied petitioner exempt status on the grounds that it is not operated exclusively for any exempt purpose and it serves private rather *143 than public interests. Petitioner has the burden of proof to show that respondent's determination is wrong. Hancock Academy of Savannah, Inc. v. Commissioner, 69 T.C. 488 (1977); Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure.
In order to be exempt under section 501(c)(3), an organization must qualify under both the organizational and the operational tests. Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. In the instant case, respondent's determination to revoke petitioner's tax-exempt status retroactive to its date of incorporation is based on his contention that petitioner does not satisfy the operational test. The operational test requires an organization's activities to be primarily those which accomplish one or more exempt purposes as specified in section 501(c)(3) and not, except to an insubstantial part, those which do not further an exempt purpose. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. A substantial nonexempt purpose will disqualify an organization from tax exemption despite the *144 number or importance of its exempt purposes. Better Business Bureau v. United States, 326 U.S. 279 (1945). An organization is not operated exclusively for one or more exempt purposes unless it serves a public rather than a private interest. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. See Baltimore Health and Welfare Fund v. Commissioner, 69 T.C. 554 (1978); Callaway Family Association v. Commissioner, 71 T.C. 340 (1978). Whether an organization satisfies the organizational test is a factual question. Christian Stewardship Assistance v. Commissioner, 70 T.C. 1037 (1978). Included among the exempt purposes of section 501(c)(3) are "educational" purposes. Sec. 1.501(c)(3)-1(d)(1)(i)(f), Income Tax Regs. "Educational" is defined as: (a) The instruction or training of the individual for the purpose of improving or developing his capabilities; or (b) The instruction of the public on subjects useful to the individual and beneficial to the community. Sec. 1.501(c)(3)-1(d)(3), Income Tax Regs.
*145 While some of petitioner's activities, such as its newsletter, inquiry centers, and seminars serve an educational purpose, activities such as its travel insurance, discount programs, and travel services clearly do not further any exempt purpose within the meaning of section 501(c)(3) and we find that petitioner has failed to prove that its nonexempt purposes are insubstantial. Specifically, while petitioner maintains that $ 23,432 or approximately 6.81 percent of its gross receipts for the fiscal year ended July 31, 1977 was expended for its insurance and discount plans, petitioner actually spent, in addition, at least a portion of the $ 218,708, or approximately 78 percent, which petitioner paid for its printing, mailing and computer service costs, in connection with these nonexempt activities. Moreover, petitioner's solicitation materials and newsletter are devoted, at least in part, to its insurance, discount programs, and other nonexempt member benefits. Petitioner compares the use of its insurance, travel, and discount plans with the use by exempt organizations of membership rallies or dinners in that they serve to attract new members and contributions. We cannot agree. *146 A fundraising event is a single occurence that may occur on limited occasions during a given year and its purpose is to further the exempt activities of the organization; by contrast, insurance, travel services, etc. are continuous or continual activities which are certainly more pervasive a part of the organization than a sporadic event and they appear to be an end in themselves. Similarly, many of petitioner's activities serve the private interests of its members. Its travel services, legal services, insurance plan, anti-theft registration and discount programs clearly serve petitioner's members' interests. To the extent that petitioner serves private rather than public interests, it is not operated exclusively for exempt purposes. See Syrang Aero Club, Inc. v. Commissioner, 73 T.C. 717 (1980). Because petitioner has failed to establish that it is operated exclusively for one or more exempt purposes as specified in section 501(c)(3), it is not entitled to exemption from taxation under section 501(a). An appropriate decision will be entered. Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended. ↩
2. The prerequisites for declaratory judgment have been satisfied: petitioner is the organization whose qualification is at issue, sec. 7428(b)(1); petitioner exhausted its administrative remedies, sec. 7428(b)(2); and petitioner filed its petition before the 91st day after respondent mailed his determination, sec. 7428(b)(3). See also Rule 210(c), Tax Court Rules of Practice and Procedure.↩
*. Petitioner deleted this activity (iii) from its certificate of incorporation by an amendment dated January 17, 1977.↩
1. Included in the disbursements for members' benefits are insurance premium payments of $ 22,253 for coverage of approximately 10,500 members and $ 1,179 for $ 1 memberships in a brand name discount purchasing plan.↩