OHIO COUNTY & INDEPENDENT AGRICULTURE SOCIETIES, DELAWARE COUNTY FAIR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ohio County & Independent Agriculture Societies v. Commissioner
Docket No. 4812-77.
United States Tax Court
T.C. Memo 1982-210; 1982 Tax Ct. Memo LEXIS 533; 43 T.C.M. (CCH) 1126; T.C.M. (RIA) 82210; April 21, 1982. Bruce W. Powell and Ernestine B. Powell, for the petitioner. Mary Helen Weber, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1972 *539 and 1973 in the respective amounts of $ 1,391.06 and $ 3,060.81. All of the facts have been stipulated and are found accordingly. Petitioner Ohio County & Independent Agriculture Societies, Delaware County Fair (Delaware County Agricultural Society), is an agricultural society whose principal place of business was in Delaware, Ohio, at the time of the filing of the petition in this case. The Delaware County Agricultural Society filed Forms 990, "Return of Organization Exempt From Income Tax Under Section 501(c) of the Internal Revenue Code (Except Private Foundation)," for the calendar years 1972 and 1973 with the Internal Revenue Service Center, Covington, Kentucky. The Delaware County Agricultural Society was founded by residents of Delaware County and, during the years 1972 and 1973, its membership consisted of residents of Delaware County. Petitioner is and was during the years 1972 and 1973 managed by a board of directors elected by the membership. Petitioner is and was during the years 1972 and 1973 operated by officers elected by the board of directors. Under petitioner's constitution, all directors and officers of petitioner must be members. *540 Article II of petitioner's constitution states: PURPOSE The purpose of this society shall be for the improvement of agriculture, domestic industry, public schools, better acquaintance of our citizenship and for wholesome entertainment. The statutory provisions of Ohio law governing county agricultural societies are found primarily in chapter 1711, Ohio Rev. Code Ann. sec. 1711.01 et seq. (Page 1978). Under these statutory provisions, county and independent agricultural societies are membership organizations formed to conduct an annual agricultural fair for the purpose of improvement and promotion of agriculture in the county and in the State, as well as to provide education and wholesome entertainment to the public at large. Ohio Rev. Code Ann. secs. 1711.04 and 1711.10 (Page 1978). These organizations are entitled to apply for and receive initial funding (not to exceed $ 800) from the county treasurer. But to obtain such funding, they first must make a report and receive a certificate from the State director of agriculture that State laws and the regulations of the Department of Agriculture have been complied with. *541 Ohio Rev. Code Ann. sec. 1711.02 (Page 1978). Further, Ohio Rev. Code Ann. sec. 901.06 (Page 1978) requires an annual meeting between the presidents or authorized representatives of agricultural societies and the director of agriculture; prior to such meeting, each society must furnish an annual report to the director of agriculture. Ohio Rev. Code Ann. sec. 1711.13 (Page 1978) provides that county agricultural societies are bodies corporate and politic, and as such are capable of suing and being sued and of holding in fee simple any real estate purchased by them as sites for their fairs. [1]
*542 Delaware County Agricultural Society is not a regulatory agency of the State of Ohio. Petitioner since its formation has conducted an annual fair known as the Delaware County Fair during a six-day period between September 1 and November 1. In 1972 the fair was held from September 17 through September 22. In 1973 the fair was held from September 16 through September 21. The Delaware County Fair consists of exhibitions of Livestock, poultry, farm products, and products of domestic industry. Prizes are given for the best of certain animals or items exhibited. In addition, on four days of the fair, harness horse racing is conducted with parimutuel betting. Since 1946 a harness race known as The Little Brown Jug has been conducted at the Delaware County Fair. The Little Brown Jug is an important harness race which together with certain other annually held races on the harness racing circuit constitutes what is known as The Grand Circuit. The winner of The Little Brown Jug receives a $ 100,000 purse. Pursuant to a contract with petitioner, The Little Brown Jug Society is paid to manage and present the race. However, the Delaware County Agricultural Society itself manages *543 and presents the other harness races conducted at the annual Delaware County Fair. The Delaware County Agricultural Society applied for and received harness racing permits from the Ohio Racing Commission for the harness races conducted at the Delaware County Fair in September 1972 and September 1973. See Ohio Rev. Code Ann. secs. 3769.04 through 3769.07 (Page 1978). During the years 1971 through 1975, petitioner made annual payments to the State of Ohio Department of Taxation for an entity known as the Ohio Fairs Fund. See Ohio Rev. Code Ann. sec. 3769.082 (Page 1978). During these same years, petitioners also paid the State of Ohio Department of Taxation an excise tax on wagering income. Both the payments to the Ohio Fairs Fund and the excise tax payments were made from amounts collected as wagers in the harness racing conducted by petitioner at the Delaware County Fair. Petitioner was required to make the payments to the Ohio Fairs Fund and the excise tax payments by Ohio Rev. Code Ann. sec. 3769.08 (Page 1978). For the years 1972 and 1973 the Delaware County Agricultural Society received *544 the following amounts from the Ohio Fairs Fund: Year
Amount
1972
$ 16,254.68
1973
14,576.12
In 1973 the Delaware County Agricultural Society was examined by the Bureau of Inspection and Supervision of Public Offices of the Office of State Auditor of the State of Ohio. The land used by the Delaware County Agricultural Society as a fairground consists of approximately 104 acres. Half of this land was acquired by the Delaware county commissioners for petitioner's use in 1938 and the other half of the land was acquired in 1952 by petitioner in its own name. See Ohio Rev. Code Ann. secs. 1711.17 and 1711.31 (Page 1978). [2]
*545 During the years 1960 through 1977 the Delaware County Agricultural Society leased its fairgrounds and facilities to the Blooded Horse Sales Company, a Kentucky corporation, for use by that company for the display and sales of horses at times other than the periods during which the Delaware County Fair was conducted. The occupancy by the Flooded Horse Sales Company was pursuant to two leases, each executed by petitioner as lessor and the Blooded Horse Sales Company as lessee. The first of these leases was dated November 18, 1960, and the second was dated November 17, 1972. The November 18, 1960, lease contained the following pertinent provisions: 1) That during the period of this lease, the lessee, Blooded Horse Sales Company, shall have the exclusive right to hold any and all equine sales that are or may be held on said premises. 2) It is understood and agreed that the lessee shall have the use of any and all stalls, barns, pavilions, etc., with the exception of the Draft Horse Barn, the use of the grounds, and the use of the Youth Building and building attached thereto, for the purpose of conducting horse and equipment sales and services in connection therewith. However, *546 it is understood and agreed that the use of the premises by the lessee shall not conflict in any way in any respect with, but shall at all times be subservient and subject to, the use of the premises by the lessor, Delaware County Agricultural Society, for its regularly scheduled events. 3) It is understood and agreed that during the period when the premises are being used by lessor for the conduct thereon of the Delaware County Fair and the running of the Little Brown Jug on or about September 22 of each year, the lessee, Blooded Horse Sales Company, shall have the right to conduct a Little Brown Jug sale, usually held the night before the running of said race, and in connection therewith the use of from sixty (60) to sixty-five (65) stalls, the exact number of stalls to be determined by the needs of the lessor, in the Breeders Barn and adjacent thereto and the right to erect in front of said barn a tent for a pavilion for the conduct of said sale, the occupancy of said sixty (60) to sixty-five (65) stalls to be for two (2) days before the sale and one (1) day after the sale. 4) It is understood and agreed that with respect to all other sales which the lessee may conduct on *547 said leased premises, including its Spring sale usually held in February of each year and its Fall sale usually held in November of each year, it shall have the privilege of holding said sales in the Youth Building, and as a part of said sale shall have the right to have areas for the display of equipment and the furnishing of food and other facilities in connection with said sale, and that during said sales it may occupy the Youth Building and the building attached and all stalls on the grounds except the Draft Horse Barn referred to above, and shall have the right to erect temporary stalls in the various sheds located on said grounds. 7) The lessee, in consideration of the lease and letting to it by the lessor, agrees to pay to the lessor the sum of Two Hundred Fifty ($ 250.00) Dollars per year on the 1st of January of each year, said sum to be credited upon the percentage of net profits realized from said sales by the lessee on the leased premises, which are as follows: Ten (10%) per cent of the first Ten Thousand ($ 10,000.00) Dollars of net profit; twenty (20%) per cent of the next Ten Thousand ($ 10,000.00) Dollars of net profit; twenty-five (25%) per cent of all in excess *548 over Twenty Thousand ($ 20,000.00) Dollars of net profit per year. The provision for determination of the rental payment in the November 17, 1972, lease was identical to that in the November 18, 1960, lease, and many of the other provisions remained unchanged. The differences in the two leases were: (1) the Blooded Horse Sales Company under the second lease only had the exclusive right to hold standard bred horse sales on the premises with any other type of equine sale requiring joint approval, and (2) there was no provision allowing the Blooded Horse Sales Company to hold a sale on the day prior to the running of The Little Brown Jug. The 1972 lease stated that the company's annual yearling sale was usually held on the Monday, Tuesday, and Wednesday of the week immediately preceding the week of the Delaware County Fair and that the Company's fall sale was usually held in November of each year. The Blooded Horse Sales Company is not a member of the Delaware County Agricultural Society and it does not, and did not in 1972 and 1973, display horses or conduct horse sales during the Delaware County Fair. The Blooded Horse Sales Company is a private corporation which conducts horse *549 auctions. The horse auctions conducted by the Blooded Horse Sales Company are limited to standard breed horses which are either pacers or trotters. The Blooded Horse Sales Company conducts such auctions of horses consigned from various farms and horse breeders from the United States and Canada. It charges a commission for its services based on the price the horse brings with a provision for aminimum commission. The Blooded Horse Sales Company also subleases space at the auction to representatives of various enterprises such as the purveyors of harness, tack, sulkeys, and medical and grooming supplies for horses. Buyers at these auctions generally come from the United States and Canada. They include breeders, trainers, and farmers. The horses are acquired by them for various uses including breeding, racing, show, pleasure, and carriage use. The Blooded Horse Sales Company conducts, and did conduct in the years 1972 and 1973, four horse sales per year in Delaware County, in February, May, August or early September, and November. The number of horses sold at the four different times of the year varies, the annual November sale being the largest and the annual May sale being the *550 smallest. Approximately the same number of horses were sold in the four sales in 1972 as in the corresponding sales in 1973. Under the November 17, 1972, lease, the Delaware County Agricultural Society received the following amounts in rents from the Blooded Horse Sales Company in 1972 and 1973: Year
Amount
1972
$ 8,247.00
1973
16,839.27
The Delaware County Agricultural Society receives its income from all sources in its own name and maintains its own books and records of income and expenditures. Petitioner's income is not recorded on the books and records of the State of Ohio or on the books and records of Delaware County as income either to the state or to the county. In 1959 the director of the Ohio Department of Agriculture applied for a group ruling as to the tax exempt status of the county and independent agricultural societies then in Ohio, including petitioner. The Internal Revenue Service issued a group ruling letter on June 30, 1960, stating that these societies were organizations described in section 501(c)(3). [3] A copy of this group ruling letter was forwarded by the director of the Ohio Department of Agriculture to the secretary of the *551 Delaware County Agricultural Society on December 5, 1960. The ruling request by the Department of Agriculture had sought a ruling that these agricultural societies in Ohio were generally exempt from Federal income taxation as organizations described in section 501(c)(5). However, the June 30, 1960, group ruling letter of the Internal Revenue Service stated that-- It is held, on the basis of all the information submitted, that the Ohio County and Independent Agricultural Societies, whose names appear on the lists submitted November 10, 1959, are exempt from Federal income tax as organizations described in section 501(c)(3) of the 1954 Code, rather than section 501(c)(5) of the Code, which is not applicable to them, as it is shown that such Societies are organized and operated exclusively for educational purposes. The notice of deficiency determining the deficiencies here in issue against petitioner contained the following explanatory statements: It is determined that you had unrelated business income within the meaning of *552 Int. Rev. Code of 1954, section 512, in the taxable years ended December 31, 1972 and December 31, 1973 in the respective amounts of $ 7,323.00 and $ 14,912.27 computed as follows: TAX YEARS ENDED
12/31/72
12/31/73
Receipts from Blooded Horse Sales
$ 8,247.00
$ 16,839.27
Less Expenses: Labor
924.00
1,890.00
Depreciation
36.50
(a) Unrelated Business Income
$ 7,323.00
$ 14,912.27
Accordingly, it is determined that you are liable for the income taxes on this income as provided for by section 511 of the Internal Revenue Code of 1954. The revenue agent who examined petitioner furnished petitioner with a copy of his report. The first sentence in the report was: "The Delaware County Agriculture Society is organized and operated under a Constitution and By-Laws as a subordinate unit of State of Ohio, Department of Agriculture." At the same time petitioner filed the petition in the instant case, it filed a petition with this Court seeking a declaratory judgment. Ohio County and Independent Agriculture Societies, Delaware County Fair v. Commissioner, docket No. 4811-77X. This Court granted respondent's motion *553 in docket No. 4811-77X to dismiss and entered an order on July 14, 1977, dismissing the action for declaratory judgment for lack of jurisdiction. Petitioner appealed the order of dismissal in the declaratory judgment action to the Sixth Circuit Court of Appeals. The appellate brief submitted by counsel for respondent to the Sixth Circuit Court of Appeals contained the following statements: The facts may be summarized as follows: Taxpayer is an entity which was organized and operated under a constitution and by-laws as a subordinate unit of the State of Ohio, Department of Agriculture. (R. A15.) The Commissioner held, in a group ruling dated June 30, 1960, that the taxpayer was exempt from federal income tax as an educational organization under Section 501(c)(3) of the Internal Revenue Code. (R. A15.) [2] * * * *554 Ohio County and Independent Agricultural Societies, Delaware County Fair v. Commissioner,610 F.2d 448 (6th Cir. 1979). Petitioner filed a petition for a writ of certiorari to the United States Supreme Court. Certiorari was denied in an order dated May 27, 1980. Pursuant to leave granted, petitioner filed an amended petition in the instant case which contained the following allegations not contained in the original petition: 6. Petitioner is an entity which was organized and operated under a constitution and by-laws as a subordinate unit of the State of Ohio Department of Agriculture. 7. That statement made in paragraph 6 constitutes a binding admission of fact made by Respondent in its "Brief for the Appellee" in a collateral action between it and Petitioner in the United States Court of Appeals for the Sixth Circuit. 8. The Respondent is collaterally estopped from denying the truth of the statement contained in paragraph 6 for the reasons set forth in paragraph 7 as well as its other prior actions and determinations. Petitioner makes two major arguments in support of its contention that the rental income it received under the lease of its fairgrounds *555 is not subject to tax under section 511. These arguments are that (1) petitioner is an instrumentality of the State of Ohio and for this reason is not subject to the tax imposed by section 511 and (2) even if it is an organization exempt from tax under section 501(c)(3) as determined in the Commissioner's ruling letter, the income which it received was not unrelated business taxable income within the meaning of section 512. Petitioner, in support of its contention that it is an instrumentality of the State of Ohio, argues that respondent in a prior related proceeding made a judicial admission that it was an instrumentality of the State of Ohio and is therefore bound by that admission in this case or that respondent is collaterally estopped by that admission from denying that petitioner is an instrumentality of the State of Ohio. Petitioner further argues (1) that section 511 is not applicable to any instrumentalities of State governments except colleges and universities, (2) that petitioner is entitled to the constitutional immunity of the State government from Federal taxation, and (3) that it is exempt from tax under section 115(a). In support of its second major position, *556 it is petitioner's contention that the rents it received are not the type of income subject to the tax on unrelated business income since (1) they are rents from real property excluded from tax under section 512(b)(3), (2) its rental activity did not constitute carrying on a trade or business, and (3) that even if the rental activity constituted the carrying on of a trade or business, that trade or business was not unrelated to its exempt purpose. Petitioner argues that the statement contained in respondent's brief submitted to the Sixth Circuit Court of Appeals that "Taxpayer is an entity which was organized and operated under a constitution and by-laws as a subordinate unit of the State of Ohio, Department of Agriculture" is a binding judicial admission that petitioner is an instrumentality of the State of Ohio. The relevant portion of the brief, which we quoted above, when read in context, makes it clear that respondent and his counsel did not factually concede that petitioner was an instrumentality of the State of Ohio. The footnote to the sentence immediately following the sentence relied on by petitioner explicitly states that the government disputed petitioner's contention *557 that it was an instrumentality of the State of Ohio. Since in our view it is clear that the statement relied upon by petitioner as an admission that it is an instrumentality of the State of Ohio is not such an admission, we do not need to discuss the various other arguments made by the parties with respect to judicial admission. Petitioner's argument that respondent is collaterally estopped from denying that petitioner is an instrumentality of the State of Ohio is based on the same statement appearing in respondent's brief in the Court of Appeals for the Sixth Circuit as is the argument with respect to judicial admission. However, petitioner here seems to rely both on the statement in respondent's brief in the Court of Appeals and in the revenue agent's report. As pointed out above, there was no admission in the brief in the Court of Appeals for the Sixth Circuit that petitioner was an instrumentality of the State of Ohio but in fact a specific denial that petitioner was such an instrumentality. Further, it has long been settled that the Commissioner is not estopped or in any way bound by legal conclusions stated in a revenue agent's report. See Blanco v. Commissioner,56 T.C. 512 (1971). *558 We therefore hold that respondent is not estopped from contending that petitioner is not an instrumentality of the State of Ohio. [4]
*559 Petitioner argues that as an instrumentality of the State of Ohio it is not an organization upon which section 511(a) imposes a tax on unrelated business taxable income. See section 511(a)(2). Petitioner contends that the only stated instrumentalities made subject to the tax by the statute are state colleges and universities, and, since it is not such an educational institution, it is not an organization which is subject to the tax. However, the tax on unrelated business taxable income is imposed on all organizations which are otherwise generally exempt from Federal income taxation under section 501(a) except for those specifically made exempt by act of Congress. Section 511(a)(2)(A). See also S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, 467. In the 1960 group ruling from the Internal Revenue Service, petitioner was determined to be an organization described in section 501(c)(3). This ruling was still in effect during the years 1972 and 1973 and, in fact, was still in effect as of the date of the trial of this case. Since petitioner is exempt from tax under section 501(c)(3), it is clearly an organization subject to a tax on its unrelated business taxable income *560 [5] unless it has constitutional immunity from Federal taxation or its income is exempt from tax under section 115(a). There is nothing in section 501(a) that prohibits a corporation which is a "subordinate unit" of a state from being exempt from tax under section 501(a). While for reasons hereinafter stated we conclude that petitioner is not an instrumentality of the State of Ohio, if it were it would not follow necessarily that it was not an organization described in section 501(a). It has long been recognized *561 that a State government possesses a constitutional immunity from Federal taxation with respect to the governmental functions. Such immunity is an implied one and is not based on any express provision found in the Constitution. The immunity exists as a result of the fundamental division between Federal and State powers inherent in our constitutional system. The concern is that without such an implied immunity, the States could be destroyed as effective governmental entities by Federal taxation of their governmental functions. Helvering v. Gerhardt,304 U.S. 405, 414-415 (1938).This immunity is not limitless. There are two guiding principles to be employed in defining the scope of the immunity of State government from Federal taxation: (1) if the burden of the tax is only indirect and remote, the tax can be imposed and (2) even if such tax falls directly on the State, the immunity extends only to those activities essential to the preservation of State government. Helvering v. Gerhardt,supra at 419-420; Troy State University v. Commissioner,62 T.C. 493, 502 (1974). Petitioner contends that it is an instrumentality of the *562 State of Ohio. Under Ohio law, petitioner is recognized as a separate legal entity as a result of having corporate status. Ohio Rev. Code Ann. sec. 1711.13 (Page 1978). It has been stipulated that petitioner is not a regulatory agency of the State of Ohio. An agricultural society such as petitioner exists under State law for the purpose of conducting an annual agricultural fair. Upon its formation, a county or independent agricultural society may qualify to receive a small amount of funds, not in excess of $ 800, from the county. Ohio Rev. Code Ann. sec. 1711.02 (Page 1978). Additionally, the county commissioners are authorized to acquire title to or to lease the real property on which the fairs conducted by a county or independent agricultural society are held. County funds may be used for such purposes; however, if the amount to be expended exceeds $ 20,000 in any one year, the matter must be submitted to the qualified voters of the county for their approval at a general election. Ohio Rev. Code Ann. sec. 1711.17 (Page 1978). Also, where a county society is indebted for $ 15,000 or more and *563 has purchased a fairground or title to such fairground is in the county commissioners, the county commissioners may, upon the petition of at least 500 qualified voters of the county, submit the question of whether county bonds should be issued to liquidate the indebtedness to the voters. Ohio Rev. Code Ann. sec. 1711.18 (Page 1978). If the issuance of such bonds is approved by majority of the voters, the bonds may be issued and sold and the proceeds used to liquidate the indebtedness of the county or independent agricultural society. The county commissioners upon the issuance of such bonds are to levy a tax on the taxable property in the county for the purpose of paying off the bonds. Ohio Rev. Code Ann. secs. 1711.18 and 1711.19 (Page 1978). Further, the county commissioners are authorized to annually appropriate an amount, not exceeding $ 2,000, for the purpose of encouraging agricultural fairs. Ohio Rev. Code Ann. sec. 1711.22 (Page 1978). It is apparent that under the statutory provisions of Ohio law a county or independent agricultural society may receive a substantial amount of financial support *564 from the county. See State v. Kerns,104 Ohio St. 550, 136 N.E. 217 (1922) (holding that granting of funds to an agricultural society incorporated under the State general incorporation statute did not violate the provision of the Ohio constitution prohibiting furnishing of government funds to private enterprises organized for profit since the agricultural society involved was clearly formed for a public purpose). Additionally, these societies are subject to some supervision by the Ohio Department of Agriculture at both their formation and in their annual operations. Ohio Rev. Code Ann. secs. 901.06 and 1711.02 (Page 1978). Nevertheless, under Ohio law these societes are generally viewed as being private corporations organized not for profit as opposed to State or Government agencies. In Dunn v. Brown County Agricultural Soc.,46 Ohio St. 93, 18 N.E. 496 (1888), it was held that an agricultural society did not have sovereign immunity with respect to an action for negligence brought by a person injured while attending a fair on the society's fairgrounds. The Ohio Supreme Court in Dunn specifically noted all the statutory *565 provisions relating to agricultural societies, including those allowing financial support of them by the county, but stated (at 498): From this summary of the statute, it is apparent that corporations formed under it are not mere territorial or political divisions of the state, or invested with any political or governmental functions, or made public agencies of the state, to assist in the conduct of its government. Nor can it be said that they are created by the state, of its own sovereign will, without the consent of the persons who constitute them, or even that such persons are the mere passive recipients of the corporate powers and duties, with no power to decline them or refuse their execution. On the contrary, it is evident that societies organized under the statute are the result of voluntary associations, by the persons composing them, for purposes of their own. It is true, their purpose may be public in the sense that their establishment may conduce to the public welfare, by promoting the agricultural and household manufacturing interests of the county; but, in the sense that they are designed for the accomplishment of some public good, all private corporations are for *566 a public purpose; for the public benefit is both the consideration and justification for the special privileges and franchises conferred on them. These agricultural societies are not only of the free choice of their constituent members, but they are also by their active procurement; for it is only when they organize themselves into a society, adopt the necessary constitution, and elect the proper officers, that they become a body corporate. The state neither compels their incorporation, nor controls their conduct afterwards. * * * See also State v. Gholson,103 Ohio App. 521, 146 N.E.2d 333 (1957) (holding that it was improper for an individual claiming that he was the proper and duly appointed officer of an agricultural society to seek a writ of mandamus requiring another party also claiming that office to turn over books and records of the society to him; an officer of such a society is not a public official but only an officer of a private corporation not formed for profit). The determination of whether an organization is a State instrumentality is of course a question of Federal law and therefore State law is not controlling. However, as far as petitioner's *567 status is concerned, even under State law it is viewed as being a charitable corporation. The record as well as our examination of Ohio law fals to show that petitioner exercises or is even capable of exercising governmental powers or authority. We find that petitioner is not an instrumentality of the State of Ohio. The tax on unrelated business income imposed on petitioner would only at most indirectly be a burden on State government. There is no constitutional immunity protecting petitioner from being subject to such a tax. Additionally, even assuming arguendo that it is an instrumentality of the State of Ohio, petitioner has failed to show that its rental activity here can be considered the exercise of an essential governmental function. Based on the record, the activity was engaged in by petitioner as a commercial endeavor solely to generate revenue for itself. Such income derived from this activity would not be immune from Federal taxation. Helvering v. Gerhardt,supra;South Carolina v. United States,199 U.S. 437, 454-455 (1905); Troy State University v. Commissioner,supra.In Allen v. Regents of University System of Georgia,304 U.S. 439 (1938), *568 the Supreme Court sustained the imposition of an excise tax on the tickets sold to football games at the Georgia School of Technology. In doing so, the Court stated (at 452): If it be conceded that the education of its prospective citizens is an essential governmental function of Georgia, as necessary to the preservation of the State as is the maintenance of its executive, legislative, and judicial branches, it does not follow that if the State elects to provide the funds for any of these purposes by conducting a business, the application of the avails in aid of necessary governmental functions withdraws the business from the field of federal taxation. Section 115 provides that gross income does not include income derived from the exercise of any essential governmental function which accrues to a State or to any political subdivision of a State. We have previously discussed petitioner's failure to show its rental activity was the exercise of an essential governmental function. Thus, petitioner's rental income is not excludable from gross income under section 115. Further, the second requirement of the statute, that such income accrue to the State or to a political subdivision *569 of the State, is not met here.The term "accrue" has been interpreted so as to require the State to be in actual receipt of such income or at least to have a vested right or enforceable claim to such income. Omaha Public Power District v. O'Malley,232 F.2d 805, 809 (8th Cir. 1956); Troy State University v. Commissioner,supra at 496-497. It has been stipulated in this case that petitioner receives its income in its own name and maintains its own books and records of its income and expenditures.Petitioner's income is not recorded on the books and recores of the State of Ohio or of Delaware County as income either of the State or of the county. Petitioner clearly does not meet the statutory requirement that such rental income accrue to the State. City of Bethel v. United States,594 F.2d 1301 (9th Cir. 1979). Under section 511(a)(1), a tax is imposed on the unrelated business taxable income of every organization described in section 511(a)(2). The term "unrelated business taxable income" is defined in section 512 as gross income derived by any organization from any unrelated trade or business regularly carried on by it less *570 the deductions which are directly connected with the carrying on of such trade or business, subject to certain modifications. Section 513 prescribes the definition of the term "unrelated trade or business." Prior to 1970 all rents from real property were excluded from the unrelated business income tax. S. Rept. No. 91-552 (1969), 1969-3 C.B. 423, 468. However, the Tax Reform Act of 1969, Pub. L. No. 91-172, sec. 121(b)(2)(A), 83 Stat. 538, amended the statute [6] to provide that such rents would not be excluded if the determination of the amount of such rents depended in whole or in part on the income or profits derived by the lessee from the property other than an amount based on a fixed percentage of gross receipts or sales. Section 512(b)(3)(B)(ii); section 1.512(b)-1(c)(2)(iii)(b), Income Tax Regs. *571 The rental provisions of the November 17, 1972, lease which petitioner entered into with the Blooded Horse Sales Company clearly tie the amount of rent to be paid to petitioner to the net profits realized by the Blooded Horse Sales Company in connection with its sales of horses at the auctions conducted on the leased premises. [7] Under the lease, petitioner is to be paid: (1) 10 percent of the first $ 10,000 of the Blooded Horse Sales Company's yearly net profits from the sales conducted on the leased premises, (2) 20 percent of the next $ 10,000 of such yearly net profits, and (3) 25 percent of all such net profits in excess of $ 20,000. However, the lease provides that petitioner is to receive a yearly minimum payment of $ 250 in all events, even if the lessee's net profit from sales in a given year is less than $ 2,500.Thus, under the express terms of the statute, the rents derived by petitioner are not to be excluded in computing a tax on unrelated business taxable income. The rentals here are based on a percentage of the lessee's net profits, not upon a percentage of gross receipts. The legislative history is explicit that this type of rental income is to be subject to tax. *572 S. Rept. No. 91-552 (1969), 1963-3 C.B. 423, 468, states: In addition, the amendments would tax property rentals of both *573 real and personal property where the rentals are measured by reference to the net income from the property. They would exclude from unrelated business income, however, rentals based upon a percentage of gross receipts. * * * Petitioner also contends that its rental activity does not amount to a trade or business. Petitioner argues that its rental income is not subject to the tax on unrelated business taxable income since it is not derived fron a trade or business. See Cooper Tire and Rubber Company Employees' Retirement Fund v. Commissioner,36 T.C. 96, 100 (1961). Thus, despite the clear indications in the legislative history quoted above that Congress believed that such income would be taxed, petitioner asserts that the income derived from its rental activity, since such activity does not constitute a trade or business, is not subject to tax. As used in section 513, the term "trade or business" has the same meaning as it has in section 162. Clarence LaBelle Post No. 217 v. United States,580 F.2d 270, 272-274 (8th Cir. 1978); section 1.513-1(b), Income Tax Regs. Even the leasing of one piece of improved real property has been held to constitute *574 a trade or business. Fegan v. Commissioiner,71 T.C. 791, 814 (1979), on appeal (10th Cir., July 30, 1979); Elek v. Commissioner,30 T.C. 731 (1958); Lagreide v. Commissioner,23 T.C. 508 (1954); Noble v. Commissioner,7 T.C. 960 (1946); Hazard v. Commissioner,7 T.C. 372 (1946). This does not mean that the ownership and management of a piece of real property will as a matter of law constitute a trade or business for section 513 purposes or for purposes of other provisions of the Internal Revenue Code. Compare Grier v. United States,120 F.Supp. 395 (D.Conn. 1954), affd. per curiam 218 F.2d 603 (2d Cir. 1955). In making the factual determination of whether there is a trade or business, the size of the property and the taxpayer's activities with respect to the property are important factors. See generally discussion in Curphey v. Commissioner,73 T.C. 766, 774-775 (1980).
Here the property in question is a large tract of improved commercial real estate. There are barns, pavilions, and other structures on the property. As of 1972 the property had *575 been rented for the past 12 years to the Blooded Horse Sales Company. In the first full year under the November 17, 1972, lease, $ 16,839.27 of rent was produced from the leasing of the property. Based on the facts present, we conclude that petitioner's rental activity for the production of income constitutes a trade or business regularly carried on. Moreover, we would note that our holding seems to comport with the legislative understanding in enacting section 512(b)(3)(B) that such income would be taxed. S. Rept. No. 91-552, supra.
Petitioner further contends, however, that even assuming that its rental activity constitutes a trade or business, the carrying on of such trade or business is not unrelated to its exempt purpose. Section 513(a) generally provides that the term "unrelated trade or business" means the conduct of any trade or business which is not substantially related, aside from the need of the organization for income or funds or the use it makes of the profits derived, to the exercise or performance by such organization of its exempt purpose. [8] The June 30, 1960, ruling from the Internal Revenue Service held that petitioner was an organization described *576 in section 501(c)(3), that is, an organization organized and operated exclusively for educational purposes by the conduct of its annual fair. The fairgrounds used by petitioner for its fair were also leased out during other times of the year to a private corporation for the conducting of horse sales auctions. Such rental activity clearly does not contribute importantly to the accomplishment of petitioner's exempt purpose of education through the holding of its annual fair.The horse auctions which the Blooded Horse Sales Company conducts under the lease take place at times other than the time of the holding of petitioner's fair. The sole purpose for the lease arrangement, from petitioner's point of view, is the generation of revenues for petitioner. Petitioner argues that such leasing is the only practical use that can be made of the fairgrounds during the part of the year when the fair is not being held. However, the mere fact that the fairgrounds are used for the holding of petitioner's annual fair does not make the rental of the grounds during other times of the year substantially related to petitioner's exempt educational purpose. Section 1.513-1(d)(4)(iii), Income Tax Regs. *577 , deals with a facility, which is necessary to the conduct of an exempt function, that is also employed in an unrelated commercial endeavor. This regulation states: *578 (iii) Dual use of assets or facilities. In certain cases, an asset or facility necessary to the conduct of exempt functions may also be employed in a commercial endeavor. In such cases, the mere fact of the use of the asset or facility in exempt functions does not, by itself, make the income from the commercial endeavor gross income from related trade or business. The test, instead, is whether the activities productive of the income in question contribute importantly to the accomplishment of exempt purposes. Assume, for example, that a museum exempt under section 501(c)(3) has a theater auditorium which is specially designed and equipped for showing of educational films in connection with its program of public education in the arts and sciences. The theater is a principal feature of the museum and is in continuous operation during the hours the museum is open to the public. If the organization were to operate the theater as an ordinary motion picture theater for public entertainment during the evening hours when the museum was closed, gross income from such operation would be gross income from conduct of unrelated trade or business. See generally section 1.513-1(d), Income *579 Tax Regs. We conclude, therefore, that the leasing activity is an unrelated trade or business which was regularly carried on by petitioner. Decision will be entered for the respondent.
Footnotes
1. Ohio Rev. Code Ann. sec. 1711.13 (Page 1978) provides as follows: Sec. 1711.13 Nature and powers of county society. County agricultural societies are hereby declared bodies corporate and politic, and as such they shall be capable of suing and being sued and of holding in fee simple any real estate purchased by them as sites for their fairs. They may mortgage their grounds for the purpose of renewing or extending pre-existing debts, and for the purpose of furnishing money to purchase additional land; but if the board of county commissioners has caused money to be paid out of the county treasury to aid in the purchase of such grounds, no mortgage shall be given without the consent of such board. Deeds, conveyances, and agreements in writing, made to and by such societies, for the purchase of real estate as sites for their fairs, shall vest a title in fee simple to the real estate therein described, without words of inheritance.↩
2. Ohio Rev. Code Ann. sec. 1711.31 states that where title to grounds occupied by an agricultural society is in the county commissioners, the control and management of such lands and improvements shall be vested in the board of directors of the society so long as the grounds are occupied by it and used for holding agricultural fairs. All funds realized by the society in holding fairs and from renting or leasing the grounds shall be held by the society and used as a fund for upkeep and improvement of the grounds. In order to convey grounds sold which are owned solely by the agricultural society, the deed may be executed by the president of the society as such, but where grounds are sold which are partly owned by the county, the deed of conveyance must be executed by both the president of the society and by the board of county commissioners. Ohio Rev. Code Ann. sec. 1711.32 (Page 1978). The consent of the county commissioners must also first be obtained before a society can encumber fairgrounds partly owned by the county. Ohio Rev. Code Ann. sec. 1711.33 (Page 1978). Where real estate or improvements thereon used by a society have been paid for by a county, upon the dissolution of the society the title to such real estate and improvements vests in the county. Ohio Rev. Code Ann. sec. 1711.23↩ (Page 1978).
3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. In its brief (p. 2), the taxpayer has declared that it has never been such an organization and that it is instead an instrumentality of Ohio, as described in Section 170(b)(1)(A)(v) of the Code. These declarations are merely the allegations of the taxpayer which, as shown, infra, the Commissioner has found to be untrue. The Court of Appeals on December 12, 1979, entered an order affirming the order of this Court dismissing the action. The December 12, 1979, order of the Circuit Court contained the following pertinent language: Appellant, Ohio County and Independent Agricultural Societies, Delaware County Fair, was determined by the Commissioner of Internal Revenue in 1960 to be entitled to tax treatment under sec. 501(c)(3) of the Internal Revenue Code which meant that it was exempt from federal income tax as an educational organization and that contributions to it are deductible under sec. 170(c)(2). However, as such an organization it is subject to such tax with respect to its "unrelated business income" pursuant to secs. 511 through 515 of the Code. Contending that it is entitled to more favorable tax treatment under the Code, i.e., that its unrelated business income not be subject to federal income tax, it filed a declaratory judgment proceeding in the Tax Court. * * * We conclude that the Tax Court was correct in its decision that sec. 7428 of the Code did not vest it with jurisdiction. * * * Here appellant is not seeking to have the Tax Court declare that it is qualified to receive favorable treatment as an organization described in sec. 501(c)(3)↩; it is seeking to have the Tax Court declare that it is qualified to receive the even more favorable treatment under other provisions of the Code.
4. From petitioner's argument we gather that it does not contend that the order of dismissal of this Court or the decision of the Circuit Court in the prior case, Ohio County & Independent Agriculture Societies, Delaware County Fair v. Commissioner,610 F.2d 448 (6th Cir. 1979), affg. an order of dismissal of this Court, collaterally estops respondent from contending in the instant case that petitioner is not an instrumentality of the State of Ohio. In any event, that case clearly does not collaterally estop respondent from taking the position in this case that petitioner is not an instrumentality of the State of Ohio. The holding in the prior case was merely that this Court lacks jurisdiction under sec. 7428 to hear a proceeding seeking a declaratory judgment with respect to whether petitioner was "an organization described in Section 170(b)(1)(A)(v)" of the Code where it has been ruled to be an organization exempt from tax under sec. 501(c)(3). In a footnote to its opinion, the Circuit Court for the Sixth Circuit pointed out that the taxpayer was also raising the sec. 170(b)(1)(A)(v) issue in the instant case. Ordinarily, of course, a dismissal for lack of subject matter jurisdiction is not a bar to a subsequent action on the same claim if proper jurisdiction of that subject matter is later obtained. See Costello v. United States,365 U.S. 265, 285-287↩ (1961). Clearly here the prior case in no way collaterally estops respondent from contending in the instant case that petitioner is not an instrumentality of the State of Ohio.
5. Petitioner takes the position that it is an organization described in sec. 170(b)(1)(A)(v) since it is a subordinate unit of the State of Ohio. Sec. 170(b)(1) merely provides a limitation of the amount of the charitable contribution deduction which will be allowed an individual taxpayer for constributions made to certain enumerated organizations in a taxable year. Sec. 170 in its entirety has nothing to do with the exemption of an organization from Federal income taxation or with the exclusion of certain types of income from gross income. Therefore, sec. 170(b)(1)(A)(v) has no bearing on whether sec. 511↩ imposes a tax on unrelated business taxable income on petitioner.
6. This amendment as applicable to the years here in issue is incorporated in section 512(b)(3) which provides: (b) Modifications.--The modifications referred to in subsection (a) are the following: (3) In the case of rents-- (A) Except as provided in subparagraph (B), there shall be excluded-- (i) all rents from real property (including property described in section 1245(a)(3)(C)), and (ii) all rents from personal property (including for purposes of this paragraph as personal property any property described in section 1245(a)(3)(B)) leased with such real property, if the rents attributable to such personal property are an incidental amount of the total rents received or accrued under the lease, determined at the time the personal property is placed in service. (B) Subparagraph (A) shall not apply-- (i) if more than 50 percent of the total rent received or accrued under the lease is attributable to personal property described in Subparagraph (A)(ii), or (ii) if the determination of the amount of such rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage or percentages of receipts or sales). (C) There shall be excluded all deductions directly connected with rents excluded under subparagraph (A).↩
7. Petitioner in its brief does not specifically argue that the profits of the Blooded Horse Sales Company were not "derived * * * from the property leased." However, there is some vague language in petitioner's brief that might be considered to be such an argument. If such an argument is intended, it is not supported by the record. Some of the profits of the Blooded Hosre Sales Company were derived from subleases of the property and the balance as commissions from auction sales of horses conducted on the premises. This is exactly the type of profits the regulations refer to as being "derived * * * from the property." See sec. 1.512(b)-1(c)(2)(iii)(b), Income Tax Regs., which incorporates the rules of sec. 1.856-4(b)(3) and (6), Income Tax Regs.↩, for the purposes of the determination of whether rents depend on the income or profit derived by any person from its sales as well as profits from subleases. Clearly, here the profits of the Blooded Horse Sales Company were derived from the property within the provisions of these regulations.
8. Petitioner also advances the argument that it should not be found to be engaged in an unrelated trade or business since the rental activity relates to the horse racing conducted at its fair. Petitioner's horse racing activities are excluded from the definition of the term "unrelated trade or business" by section 513(d) because such activities constitute qualified public entertainment activities. However, the rental agreement with the Blooded Horse Sales Company provides that the horse sales auctions will take place at times of the year other than during the time petitioner is carrying on its annual fair. Thus, the horse sales auctions are not held in conjunction with petitioner's annual fair. Sec. 513(d)(2)(B)(i). See also sec. 513(d)(2)(A). While horse sales auctions may otherwise meet the definition of sec. 512(d)(2)(A), the statute envisions that such activity be conducted in connection with the organization's annual fair or exhibition promoting agricultural and educational purposes. In contrast to the horse races it conducts, the rental activity involving the horse sales auctions conducted by the Blooded Horse Sales Company are not carried on during or as a part of petitioner's annual fair. Although petitioner argues that its horse racing is an exempt function, such is clearly not the case. While the legislative history states that Congress did not believe that conducting horse racing at a fair is generally unrelated to the exempt purpose of a county fair association, the indication is that Congress perceived the organization's educational purpose to be the exempt purpose. The legislative history in pertinent part states as follows: It has come to the committee's attention that, in two instances, the Internal Revenue Service has ruled that activities which are not conducted in competition with commerciaal activities of taxpaying organizations are nevertheless considered to be unrelated trade or business activities which are subject to the unrelated business income tax. In one case (Rev. Rul. 68-505, 1968-2 C.B. 248), the Service ruled that an exempt county fair association which conducts a horse racing meet with parimutuel betting is carrying on an unrelated trade or business subject to the unrelated business income tax.* * * The committee does not believe that the activities dealt with in those rulings are generally unrelated to the exempt purposes of the organizations that conduct them. It is customary for tax-exempt organizations to provide entertainment, including horse racing, at fairs and expositions in order to attract the public to the educational exhibits on display. * * * S. Rept. No. 94-938 (1976), 1976-3 (Vol. 3) C.B. 57, 640↩.