**ORANGE COUNTY AGRICULTURAL SOCIETY, INC., Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 587, Docket 88–4161.

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1989.

Decided Jan. 19, 1990.

Ronald Jay Cohen, Walden, N.Y. (John H. Thomas, Jacobwitz and Gubits, Walden, N.Y., of counsel), for petitioner-appellant.

Murray S. Horwitz, Tax Div., Dept. of Justice, Washington, D.C. (Peter K. Scott, Acting Chief Counsel, I.R.S., Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Robert S. Pomerance, Tax Div., Dept. of Justice, Washington, D.C., of counsel), for respondent-appellee.

Before OAKES, Chief Judge, PRATT, Circuit Judge, and SAND,[*] District Judge.

SAND, District Judge:

Orange County Agricultural Society, Inc. ("Society" or "Taxpayer") commenced this action in the United States Tax Court pursuant to section 7428(a) of the Internal Revenue Code [1] seeking a declaratory judgment that, contrary to the determination of the Commissioner of Internal Revenue, it remained qualified as a tax-exempt organization under section 501(c)(3). After trial, the Tax Court, Julian I. Jacobs, J., sustained the Commissioner's determination and held that Taxpayer is no longer so qualified. We affirm.

## BACKGROUND

Taxpayer was incorporated in the State of New York in 1866 to promote the interests of agriculture and horticulture in Orange County, New York. Since 1840, Taxpayer annually sponsors the Orange County Fair ("Fair") which includes activities such as the exhibiting and judging of animals, farm and garden products, arts,

---

[*] Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

1. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954 (26 U.S.C.), as amended.

crafts, sewing and canned goods as well as contests, carnival rides, music, entertainment and a demolition derby. Situated on the fairgrounds is a clay, oval racetrack ("Speedway") which has been used since 1928 for automobile races. The Fair is held in late July and early August on 43.5 acres of land owned by Taxpayer in Middletown, New York. Prior to 1980, the Fair was held for nine days; since 1980, the Fair has been held for twelve days.

Taxpayer leases the automobile racetrack and grandstand to Orange County Fair Speedway, Inc. ("OCF"), which was formed to insulate Taxpayer from potential liability. At all times, a major shareholder in Taxpayer owned all of the stock in OCF. The current lease provides (1) that the rental payments due to Taxpayer shall equal the balance of all receipts received by OCF from all sources after all its expenses are paid and (2) that the net receipts from the concessions at the Speedway shall be divided equally between OCF and Taxpayer. While OCF actually operates the races, Taxpayer wets down the racetrack, maintains an emergency stand-by crew to undertake electrical repairs, pays for all electrical repairs, and provides for the cleanup and repair of guardrails and fences. Since 1975, OCF has scheduled 24 to 25 races each year on Saturday nights from April to October as well as on Wednesdays during the Fair. Only three or four of the scheduled races each year are held while the Fair is in progress.

The following chart summarizes Taxpayer's revenues for its fiscal years ending October 31, 1975 through 1977, the period covered by the Internal Revenue Service ("I.R.S.") audit of Taxpayer:

| Year | Racing & Concession Revenues | Total Revenues | Racing & Concession Revenues as a Percent of Total Revenues |
|---|---|---|---|
| 1975 | $197,500.00 | $569,842.13 | 34.7% |
| 1976 | $204,000.00 | $699,778.56 | 29.2% |
| 1977 | $233,040.77 | $715,832.87 | 32.6% |

To provide additional parking during the fairs, Taxpayer leases 90 acres of adjacent land from Middletown–Wallkill Improvement Corporation ("M–W"), a for-profit corporation. M–W is owned by Taxpayer's three largest shareholders, who own approximately 70 percent of Taxpayer's stock. The president of Taxpayer also served as the president of M–W between 1976 and 1979. As rent, Taxpayer pays the real estate taxes on the land it leases from M–W, approximately $28,000 per year. Taxpayer has also made numerous unsecured and interest-free loans to M–W. M–W has not paid any dividends to its shareholders.

After auditing Taxpayer for its fiscal years 1975 through 1977, the Commissioner of Internal Revenue revoked Taxpayer's exemption under section 501(c)(3) on two separate grounds:

The organization was associated in the operation of a race track enterprise, an activity which was not in furtherance of its exempt purpose and in contravention of Section 1.501(c)(3)–1(c) of the Income Tax Regulations.

The organization made loans without interest, security or notes to corporations to which it was related through common ownership of stock, such action resulting in the organization serving a private rather than a public interest and thereby contravening the requirements of Section 1.501(c)(3)–1(d)(1)(ii) of the Income Tax Regulations.

Following a trial, the Tax Court sustained the revocation of Taxpayer's exempt status on both grounds. *Orange County Agricultural Society, Inc. v. Commissioner*, 55 T.C.M. (CCH) 1602 (1988).

## DISCUSSION

Section 501(a) confers tax-exempt status on corporations organized and operated ex-

clusively for charitable, educational and other specified exempt purposes within the meaning of section 501(c)(3), provided that no part of the organization's net earnings inures to the benefit of any private shareholder or individual. The taxpayer has the burden of demonstrating that it is entitled to tax-exempt status pursuant to section 501(c)(3). Rule 217(c), Tax Court Rules of Practice and Procedure; *see also Bubbling Well Church of Universal Love, Inc. v. Commissioner*, 670 F.2d 104, 106 (9th Cir. 1981).

### A. Substantial Non–Exempt Purpose

■ The first issue addressed by the Tax Court is whether Taxpayer meets the "operated exclusively" test of section 501(c)(3). According to Treasury Regulations:

> An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

Treas.Reg. § 1.501(c)(3)–1(c)(1). The presence of a single non-exempt purpose, if substantial in nature, will destroy the exemption. *Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945).

We review the Tax Court decision for clear error. The conclusion that an organization is operated for a substantial non-exempt purpose is a finding of fact entitled to deferential review. *See Church By Mail, Inc. v. Commissioner*, 765 F.2d 1387, 1390 (9th Cir.1985); *Ohio Teamsters Educ. & Safety Training Trust Fund v. Commissioner*, 692 F.2d 432, 435 (6th Cir.1982).

The record supports the Tax Court's finding that Taxpayer's involvement in the operation of the racetrack was extensive:

> The totality of the facts inescapably leads us to the conclusion that the arrangement between the Society and OCF was more than that of a lessor and lessee. In reality, OCF was but a corporate shield designed to protect the Society against potential liability arising from the conducting of automobile races at the Speedway.

*Orange County*, 55 T.C.M. (CCH) at 1604. Taxpayer indeed concedes that OCF was its alter ego. Therefore, despite the existence of two corporate entities, there is no dispute that Taxpayer was associated in the operation of a racetrack enterprise. Adequate support also exists for the Tax Court's conclusion that Taxpayer's involvement in the racing activities at the Speedway was not in furtherance of its stated exempt purpose (i.e., to promote agriculture and horticulture in Orange County).

■ Taxpayer advances the contention that it is entitled to the safe harbor protection offered by section 513(d)(4), which provides that an organization will not lose its tax-exempt status by conducting qualified public entertainment activities. A public entertainment activity is defined in section 513(d)(2)(A) as:

> [A]ny entertainment or recreational activity of a kind traditionally conducted at fairs or expositions promoting agricultural and educational purposes, including, but not limited to, any activity one of the purposes of which is to attract the public to fairs or expositions or to promote the breeding of animals or the development of products or equipment.

Qualified public entertainment activity includes public entertainment activity conducted "in conjunction with" a fair or exposition. § 513(d)(2)(B). Taxpayer argues that all of the racetrack activity constitutes permissible pre-fair and post-fair hype necessary to organize, operate and promote such a large public fair.

We agree with Taxpayer that the few races held during the Fair (and arguably those held immediately prior thereto) are qualified public entertainment activities and should have been disregarded when the Tax Court considered Taxpayer's exempt status. *See* Rev.Rul. 67–216, 1967–2 C.B. 180 (organization that conducts annual agricultural fair with entertainment and recreational facilities to attract the public qualifies for exemption); S.Rep. No. 94–938, 94th Cong., 2d Sess., U.S.Code Cong.

& Admin. News 1976, p. 2897, reprinted in 1976–3 C.B. 57, 639–41. The other races, however, do not fall within the statutory definition. *See Ohio County & Independent Agricultural Societies, Delaware County Fair v. Commissioner*, 43 T.C.M. (CCH) 1126, 1135–36, 1136 n. 8 (1982). Those races held at the Speedway when the Fair was not being held—some of which were as much as three months before or after the Fair—were not public entertainment activity because they were not intended to attract the public to the Fair. Those races also cannot be classified as qualified public entertainment activity because they were not held "in conjunction with" the Fair. Therefore, when deciding whether Taxpayer engaged in substantial non-exempt activity, the Tax Court should have considered only the races held prior to and after the Fair. *See also* Treas.Reg. 1.513(d)(4)(iii) (dual use of assets for exempt and non-exempt purposes).

However, assuming anything other than gross disproportionality, the revenues from only those races held before and after the fairs would still be substantial. Just three or four of the races each year were held during the annual Fair. The burden rested with Taxpayer to show that a disproportionate share of the race and concession revenues were earned at the races held during the Fair if this were in fact the case. In addition, it was proper for the Tax Court to consider the contributions by Taxpayer to OCF's start-up expenses and to the maintenance and clean up of the Speedway. After examining all of the evidence in the record, we affirm the Tax Court's finding that "[t]he Society's involvement in the automobile racing activities exceeded the benchmark of insubstantiality." *Orange County*, 55 T.C.M. (CCH) at 1604. *See e.g., Associated Master Barbers & Beauticians of America, Inc. v. Commissioner*, 69 T.C. 53, 68–69 (1977) (revocation of tax exemption where approximately 30 percent of revenues derived from non-exempt activity).

■ Taxpayer also argues that if the I.R.S. found that it was engaged in non-exempt activity, the I.R.S. should have taxed the racing income as "unrelated business income" under section 511 rather than revoke Taxpayer's exempt status. In support of its argument, Taxpayer cites several tax rulings that considered the application of the unrelated business income tax provisions. Those rulings, however, all assumed that the organization in question qualified in the first instance as a tax-exempt entity and focused on the definition of unrelated business income. *See* Rev.Rul. 80–298, 1986–2 C.B. 197 (lease of university stadium to professional football team involves unrelated trade or business; does not address directly tax exemption issue); Rev.Rul. 60–86, 1960–1 C.B. 198 (unrelated business income tax applies where non-exempt activity constitutes 50 percent of annual income; does not address directly tax exemption issue); Rev.Rul. 57–313, 1957–2 C.B. 316 (unrelated business income tax applies where non-exempt activity constitutes 75 percent of gross receipts; does not address directly tax exemption issue). Taxpayer's argument ignores the statutory language of section 511 that imposes the unrelated business income tax only on "any organization ... which is exempt ... from taxation under this subtitle by reason of section 501(a)." Before the unrelated business income tax applies, the taxpayer must qualify as a tax-exempt entity. *See* Rev. Rul. 78–385, 1978–2 C.B. 174 (religious broadcasting organization can broadcast an insubstantial amount of commercially-sponsored programs without losing its exempt status, but the revenues not substantially related to its exempt purpose are subject to the unrelated business income tax). At the time section 511 was enacted, the Senate Finance Committee explained the relationship between the new tax and the requirements of section 501:

> In fact it is not intended that the tax imposed on unrelated business income will have any effect on the tax-exempt status of any organization. An organization which is exempt prior to the enactment of this bill, if continuing the same activities, would still be exempt after this bill becomes law. In a similar manner any reasons for denying exemption prior to enactment of this bill would continue

to justify denial of exemption after the bill's passage.

S.Rep. No. 2375, 81st Cong., 2d Sess., U.S. Code Cong.Serv.1950, p. 3053, reprinted in 1950–2 C.B. 483, 504. Thus, a taxpayer with substantial non-exempt activities cannot avoid the revocation of its tax-exempt status simply by paying the unrelated business income tax, a tax which we note Taxpayer did not offer to pay until the Commissioner's adverse determination as to exempt status.

### B. Inurement of Earnings to Private Benefit

■■■ Alternatively, even if Taxpayer's involvement in the racetrack activity other than during or immediately preceding its annual Fair did not reach a level of substantiality, we find no error in the Tax Court's finding that "part of the Society's earnings inured to the benefit of private interests ... in contravention of section 501(c)(3)." *Orange County*, 55 T.C.M. (CCH) at 1605; *see also* Treas.Reg. 1.501(c)(3)–1(c)(2). An organization will not qualify for tax-exempt status if even a small part of its income inures to a private individual. *See Church of Scientology of California v. Commissioner*, 823 F.2d 1310, 1316 (9th Cir.1987), *cert. denied*, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988). A finding of private inurement by the Tax Court is primarily a factual finding, and again we review for clear error. *See id.* at 1317. The burden of proof is on the taxpayer to demonstrate that insiders do not benefit from the tax-exempt organization, especially where the facts indicate transactions arguably not on arm's length terms. *See id.; Bubbling Well Church*, 670 F.2d at 105; *Parker v. Commissioner*, 365 F.2d 792, 799 (8th Cir.1966), *cert. denied*, 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967).

■■■ The stipulated record indicates that Taxpayer made several interest-free loans to M–W without obtaining any written security or even any written evidence of indebtedness. While some loan repayments have been made, the repayments do not match the loan amounts, and the total amount loaned exceeds the total repaid. There is no evidence in the record indicating whether the full amounts Taxpayer loaned to M–W have been or will ever be repaid. The record also does not support Taxpayer's argument that some of the loans were in fact prepayment of rent.

Courts have frequently held that loans extended on advantageous terms by an exempt organization to its founders or shareholders, or to an entity controlled by them, indicate private inurement in violation of section 501(c)(3):

> Although control of financial decisions by individuals who appear to benefit personally from certain expenditures does not necessarily indicate inurement of benefit to private individuals, those factors coupled with little or no facts in the administrative record to indicate the reasonableness and appropriateness of the expenses are sufficient to convince us that there is indeed prohibitive private inurement.

*Unitary Mission Church v. Commissioner*, 74 T.C. 507, 515 (1980); *see also Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 412 F.2d 1197, 1202 (1969). We are not persuaded by Taxpayer's emphasis on the absence of dividend payments to the shareholders of M–W. The relationship between M–W and Taxpayer enabled those shareholders to maintain their equity interests in a 90–acre parcel of vacant land free of any cost to them. Taxpayer has not met its burden to refute the inference of financial benefit to M–W. The Tax Court's finding of private inurement is not clearly erroneous.

### CONCLUSION

The judgment of the Tax Court is affirmed.

GEORGE C. PRATT, Circuit Judge, concurring:

While I disagree with the majority in its conclusion of the "nonexempt-purpose" issue, I agree with its conclusion on the "inurement" issue and therefore concur in the judgment.